**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael E. PROTSMAN, Defendant–
Appellant.**

**No. 01–4294.**

United States Court of Appeals,
Sixth Circuit.

Aug. 26, 2003.

David O. Bauer, Asst. U.S. Attorney, U.S. Attorney's Office for the Western Division, Toledo, OH, for Plaintiff–Appellee.

Christopher J. Pagan, Repper, Powers & Pagan, Middletown, OH, for Defendant–Appellant.

Before KEITH, MOORE, and GIBBONS, Circuit Judges.

OPINION

MOORE, Circuit Judge.

Defendant–Appellant Michael E. Protsman ("Protsman") appeals his jury conviction under 18 U.S.C. § 922(a)(6) for making a false statement in acquiring a firearm and under 18 U.S.C. § 922(g) for being a felon in possession of a firearm. Protsman contends that the government subjected him to a two-hour custodial interrogation, during which he signed an incriminating statement, without first advising him of his *Miranda* rights. Protsman raised this same argument before

the district court in a motion to suppress the statement, and the district court promptly overruled it. Protsman's appeal reasserted his *Miranda* violation claim and additionally raised Commerce Clause and Second Amendment challenges to the enactment of §§ 922(a)(6) and 922(g) and an Ex Post Facto Clause challenge to the use of his domestic violence conviction predating § 922(g)(9)'s enactment to convict him under § 922(a)(6). At oral argument, Protsman narrowed his challenges on appeal by expressly waiving all appellate issues other than the alleged *Miranda* violation. Accordingly, our decision addresses only the issue of whether Protsman was in custody at the time he signed the incriminating statement such that *Miranda* warnings were required. We now **AFFIRM** the district court's conclusion that Protsman was not in custody.

## I.

On September 22, 1999, Protsman entered Gordon's Sportsman Supply ("Gordon's") in Van Wert, Ohio to purchase a 9–mm firearm. Because Gordon's was a federally-licensed firearms dealer. Protsman was required to complete the Bureau of Alcohol, Tobacco, and Firearms' ("ATF") Form 4473, known as a Firearms Transaction Record. The form contains a series of questions directed at the prospective firearms purchaser including questions regarding the purchaser's criminal history. Specifically, the form asks the potential purchaser whether he or she has been convicted of a felony and whether he or she has been convicted of a misdemeanor of domestic violence.[1] An affirmative response to either of these questions prohibits the potential purchaser from obtaining the firearm.

Protsman untruthfully answered "no" to both of these questions because he previously had been convicted of both misdemeanor domestic violence and felony marijuana trafficking. Despite Protsman's lies, a criminal background check pursuant to the Brady Bill revealed Protsman's misrepresentation and instructed Gordon's to deny the firearm purchase. This denial alerted Toledo ATF agents to Protsman's attempted firearm purchase and his violation of 18 U.S.C. § 922(a)(6).

Approximately nine months after Protsman's unsuccessful trip to Gordon's, Protsman visited the apartment of Margaret Heath ("Heath"). Unbeknownst to Protsman, Heath was working as a government informant, and she had a transmitting device in her apartment that allowed law enforcement officials to monitor and record transactions between her and various targeted individuals. While at her home, Protsman sold Heath a .22–caliber revolver and ammunition. After the transaction was complete, Heath turned over the weapon and ammunition to government authorities.

On August 3, 2000, ATF agents visited Van Wert, planning to interview Protsman regarding the attempted gun purchase at Gordon's and the gun sale to Heath. Earlier in the week, the ATF agents in collaboration with the Van Wert police department agreed that they would not prearrange an interview, but rather together they would locate Protsman to request an interview once the ATF agents arrived in Van Wert. Coincidentally, on the same

---

1. The parties did not include ATF Form 4473 in the Joint Appendix. However, the government's brief quotes the questions from the form as follows: (1) "Have you been convicted in any court of a crime for which the judge could have imprisoned you for more than one year," and (2) "Have you been convicted in any court of a misdemeanor crime of domestic violence." Appellee's Br. at 6.

day that the ATF agents were scheduled to arrive, Protsman and his friend Jonathan Dewitt ("Dewitt") visited the Van Wert police station requesting a peace officer's assistance with an unrelated dispute involving Dewitt's van. While at the station, a Van Wert police officer informed Protsman to be "ready" for an ATF interview later in the day.

Protsman, Dewitt, and a uniformed police officer left the station to go to the scene of the van dispute located three or four blocks away. When they were getting ready to depart from the van-dispute scene after they were unsuccessful in obtaining the vehicle, a police officer informed Protsman that he needed to return to the stationhouse for the ATF interview. Accompanied by DeWitt, Protsman returned to the stationhouse. While Protsman was waiting for the ATF interview to commence, the Van Wert police dispatcher told Protsman that he could not leave the stationhouse. At one point during the wait, Protsman went outside to smoke cigarettes and met up with Van Wert Lieutenant Mengerink ("Mengerink"). Protsman asked Mengerink's permission to leave and come back before the interview started. According to Mengerink, he told Protsman that he did not care if Protsman left, but asked if Protsman would come back to talk with the agents who were

supposed to arrive around 1:00 p.m. Mengerink recalls that Protsman left briefly. after Protsman assured Mengerink that he would return.

Once the ATF agents arrived and Protsman returned to the stationhouse. the ATF agents accompanied by one Van Wert police officer brought Protsman to the city council's chambers for questioning. Dewitt attempted to come along, but the officers did not permit Dewitt to accompany his friend. The officers chose the city council chambers, which occupies the upper floors of the police department building, because it was the only available room large enough to accommodate comfortably the three law enforcement officers and Protsman. Although the parties have factual disputes regarding the interview itself and the timeframe leading up to the interview, both Protsman and the government admit that at or near the beginning of the interview Protsman was informed that he was not under arrest and could leave. Both parties also agree that Protsman was not read his *Miranda* rights, either before, during, or after the interview.[2]

During the interview, Protsman asked if he needed a lawyer, and the officers responded by telling him again that he was not under arrest and that he was free to go if he wanted.[3] Supporting Protsman's

---

2. The interview of Protsman in the city council chambers was taped. After the officer stated the time, place, and people present, he began by telling Protsman that: "You are not under arrest or anything like that, whatever you say to us as far as I'm concerned you can leave today, okay?" The officer proceeded to explain to Protsman why the ATF agents were interested in interviewing Protsman, mentioning the gun sales, and that it was important for Protsman to be "straight" with them. After Protsman indicated that he had nothing to hide, he questioned: "but I ain't under arrest, I don't need no attorney present or anything like that?" Although, the tape was largely muffled, one audible section of the tape clear-

ly captured the officer's response "You're not under arrest ... you're free to leave if you want to ... but we do want you to cooperate with us." 8/3/00 Protsman Interview Tape.

3. The district judge, when ruling from the bench, stated that when Protsman asked whether he needed a lawyer, the officer's response was "you are not under arrest, you are free to go at any time." J.A. at 95 (Tr. of Hr'g on Mot. to Suppress). Although we believe that the actual words used by the officer were "you're free to leave if you want to," we do not think that the officers' failure to inform Protsman that he could leave "at any time" is determinative, as long as the officers made it

account of the events, an ATF officer testified that the Van Wert officer responded to Protsman's question by stating "that's why I called these fellows here." referencing the ATF officers. J.A. at 72 (Tr. of Hr'g on Mot. to Suppress).[4] At some point during the interview, Protsman signed an incriminating written statement,[5] admitting that he lied about his prior convictions when attempting to buy a gun at Gordon's. At the close of the two-hour long interview, Protsman was not arrested, and he returned to his home.

On May 2, 2001, a federal grand jury handed down a three-count superseding indictment charging Protsman with one count of making a false statement to procure a firearm and two counts of being a felon in possession of a firearm. Protsman moved to suppress the statement he had provided the ATF officers as violative of the Fifth, Sixth, and Fourteenth Amendments. The district court denied this motion. Protsman ultimately was convicted of two counts, making a false statement to procure a firearm and being a felon in possession of a firearm, and was sentenced to seventy months in prison. This timely appeal followed.

## II.

Because both parties concede that no *Miranda* warnings were given to Protsman at any time during the interview. the dispute revolves around whether the interview can be considered a custodial interrogation, making *Miranda* warnings

necessary, or whether the interview was noncustodial and therefore *Miranda* warnings were not required. We review a district court's findings of fact on suppression issues for clear error and its legal conclusions de novo. *United States v. Crowder,* 62 F.3d 782, 785 (6th Cir.1995), *cert. denied,* 516 U.S. 1057, 116 S.Ct. 731, 133 L.Ed.2d 682 (1996). Whether an interview is considered custodial or noncustodial is a mixed question of law and fact, and thus we review it de novo. *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir.1998).

The Fifth Amendment to the United States Constitution states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Based on this right, the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), determined that criminal suspects could not be subject to custodial interrogations without first being informed of their constitutional rights to remain silent and to have defense counsel. *Id.* at 444–45, 86 S.Ct. 1602. The *Miranda* Court further defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602. With this in mind, what has come to be known as *Miranda* warnings are not only necessary in the classic arrest situation, but also "serve[ ] to protect persons in all settings in which their freedom of

---

clear that he was not under arrest and was free to leave.

**4.** Although many of the voices and comments on the tape are inaudible, the recording clearly reveals that the officer responded to Protsman's question by stating that Protsman was "free to leave" if he wanted. However, the poor quality of the tape and the many muffled comments that are unintelligible also can sup-

port Protsman's contention that the officer told him that the ATF officers sufficed for a lawyer.

**5.** As Protsman gave his statement, an officer transcribed it. Thereafter, Protsman was permitted either to have the statement read back to him or to read the statement himself, and then he was allowed to make any necessary changes.

action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467, 86 S.Ct. 1602. "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Thus, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 324, 114 S.Ct. 1526 (quotation omitted).

The Supreme Court has established that a noncustodial interrogation will not require *Miranda* warnings simply because the interrogation took place in a "coercive environment." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (holding that the interrogation was noncustodial when defendant voluntarily came to the stationhouse, was informed that he was not under arrest, and was permitted to leave after a thirty-minute interview). Otherwise, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Id.* In addition, a noncustodial interview is not transformed into a custodial one simply because "the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id.*

The Sixth Circuit employs a totality of the circumstances approach when deciding whether or not a suspect is in custody. *United States v. Sivils,* 960 F.2d 587, 597 (6th Cir.), *cert. denied,* 506 U.S. 843, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992); *see also United States v. Harris,* 611 F.2d 170, 172 (6th Cir.1979) ("[I]t is clear that the question of custodial interrogation is not dependent on any single factor but must be determined on the basis of the totality of the circumstances surrounding the interrogation."). One aspect of this test permits courts to ask whether "a reasonable person in the defendant's position [would] have felt that he was under arrest or was 'otherwise deprived of his freedom of action in any significant way.' " *United States v. Knox,* 839 F.2d 285, 291 (6th Cir.1988) (quoting *Miranda,* 384 U.S. at 477, 86 S.Ct. 1602), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).[6] Although the specific circumstances of each case are essential to making a custody determination, the Supreme Court has reminded courts that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (internal quotation omitted).

Protsman argues that a reasonable person in his position would not have believed that he was free to leave. The factors

---

**6.** In previous cases involving interrogations taking place in a suspect's residence, we have identified factors useful for a determination of whether the suspect was in custody for purposes of *Miranda. See Salvo,* 133 F.3d at 950 (considering the length and purpose of the questioning, "whether the place of the questioning was hostile or coercive," whether the suspect was informed that he was "free to leave," whether the suspect was restrained or had "freedom of movement," and whether the

suspect either initiated contact with the police or agreed to answer questions). Although police questioning taking place in the suspect's home or place of work is likely to be less intimidating than questioning taking place at the police station, we note that many of these same factors are relevant for assessing the custodial nature of interrogations taking place in the inherently more coercive environment of the stationhouse.

Protsman identifies as evidence that his was a custodial interview include that: (1) he was a suspect; (2) the police possessed the allegedly false ATF Form 4473 as evidence against him; (3) the ATF officers knew that he had sold a firearm to an informant; (4) the police officers told him to be "ready" for an ATF interview, that "he had to go back" to the station, and that he "could not leave" the station; (5) he lacked education, reading ability, and previous dealings with police questioning which caused him to feel more compelled by the officer's instructions; (6) the environment was hostile and coercive; (7) his friend, Dewitt, was not permitted to attend the interview; (8) the three-on-one interview lasted two hours; and (9) he asked if he needed a lawyer. Under the totality of the circumstances approach, Protsman asserts that he was in custody and, therefore, the officers' failure to read him the *Miranda* warnings was unconstitutional.

Determining whether Protsman was in custody is complicated insofar as factors exist supporting both views on this issue. The factors favorable to Protsman's position range from the location to the length of the interview. The ATF agents took Protsman. a chief suspect in two crimes, to the city council chambers for an interview designed to bolster their case against him. This environment, while not a jail cell or interrogation room, still had an aura of coerciveness because he was interviewed by three law enforcement officials, outside the presence of his friend, and in a location attached to the police station. In addition, Protsman's request for a lawyer is an indicator that the interview felt custodial to him. The strongest factor in Protsman's

favor, however, is that Protsman was told by police department personnel on two separate occasions that he had to go back to the police station and that he could not leave the station.[7]

On the other side of the totality of the circumstances test are the factors supporting the district court's finding that Protsman's interview was noncustodial. The chief factor in support of this position is that, just as the interview began, Protsman was informed that he was not under arrest and that he was free to go. *See Mathiason*, 429 U.S. at 495, 97 S.Ct. 711 (suggesting that a suspect is not in custody when he is informed that he is not under arrest, has a reasonably brief interview, and is allowed to leave at the completion of the interview). In addition, Protsman was not handcuffed or physically restrained in any way. *See Sivils*, 960 F.2d at 598 (noting that "[n]o physical restraint or compulsion was employed" during the defendant's interviews). Moreover, the fact that the ATF officers and the Van Wert police had probable cause to believe that Protsman committed these offenses does not transform a noncustodial situation into a custodial one. *See Mathiason*, 429 U.S. at 495, 97 S.Ct. 711. Thus, it would follow that the officers' possession of evidence against Protsman also does not change the nature of the interview. Protsman's attempt to use his lack of previous dealings with the police and his question on whether he needed a lawyer as objective evidence in support of a finding of custody, likewise, is not appropriate because these factors involve entirely subjective considerations, and thus, are not to be considered.[8] *See Stansbury*, 511 U.S. at 323, 114

---

7. He also was told to "be ready" for the ATF interview. However, we consider this phrase to be merely a request or advice and not a restraint on Protsman's movement.

8. Protsman's question regarding his need for a lawyer suggests that Protsman might have invoked his right to counsel had he been informed of his rights, but it does not support his argument that a reasonable person in his

S.Ct. 1526. Finally, while Protsman's interview arguably could be considered a coercive environment based on its length, composition, and location, these factors are insufficient for establishing the custodial interrogation needed to invoke *Miranda. Knox,* 839 F.2d at 293 (rejecting "as the sole criterion for the attachment of *Miranda* rights, reliance on the concept of an 'inherently coercive environment'"); *see also Mathiason,* 429 U.S. at 495, 97 S.Ct. 711.

The key is that Protsman was completely free to move about and he was neither told that he was under arrest nor threatened with arrest. *Sivils,* 960 F.2d at 598. He quite simply was not deprived of his freedom of action in any significant way. *See Miranda,* 384 U.S. at 467, 86 S.Ct. 1602. While it is entirely possible for a reasonable person in Protsman's position to have believed he was not free to leave when the police department personnel told him that "he had to go back" to the station, and that he "could not leave," the interviewing officer's subsequent statements at the beginning of the interview— that he was free to leave if he wanted— negated any idea that the interview was custodial in nature.[9] Protsman, himself,

after being told by a police officer that he had to return to the stationhouse and by a police dispatcher that he could not leave.[10] nevertheless left the stationhouse after securing Mengerink's approval. When the interview concluded. Protsman once again left the stationhouse.

Although this case is by no means one-sided, construing the factors using the totality of the circumstances test, we must conclude that Protsman's interview was noncustodial. A reasonable person in Protsman's situation, after twice being told that he was free to leave, would have felt that he could elect to leave or terminate the interview. We find it important to note that while the initial statements used by the police department[11] to secure Protsman's presence at the police station can lead to a conclusion that the interview was custodial, in this case the interviewing officer's subsequent assurances to Protsman that he was not under arrest and could leave if he wanted negated any inference that the interview was custodial. Protsman, similar to the defendant in *Mathiason,* was not in a custodial situation because he voluntarily came to the stationhouse, was informed that he was not under

position would not have felt free to terminate the interview.

9. In *Gardenhire v. Schubert,* 205 F.3d 303 (6th Cir.2000), we upheld a district court's decision to deny qualified immunity to a police officer because a reasonable jury could have found that the officer's actions amounted to an arrest of the plaintiffs. *Id.* at 314. We noted that a jury could find that reasonable people in the plaintiffs' position would not feel free to leave when an officer told them that they "needed to go" to the police station, read them their *Miranda* warnings at the station, questioned them extensively at the station, told them that they "needed to follow" a police officer to the station, and informed them that they would be booked and released on bond. *Id.* We concluded that "[a] police officer's statement that you 'need to go' some-

where carries substantial authoritative weight. We think very few people could hear such a directive from a police officer and still think that they were free to act otherwise." *Id. Gardenhire* differs in two significant ways from this case: first, unlike Protsman, the Gardenhires were told that they would be criminally charged; second, unlike the Gardenhires, Protsman was told he was free to leave the police station.

10. We note that only one of these statements was made by an officer. It was the police dispatcher who told Protsman that he could not leave.

11. We are referring to the statements made to Protsman that "he had to go back" to the police station and that he "could not leave."

**536**

arrest, was not placed under arrest, and was allowed to leave at the conclusion of his interview. *See Mathiason,* 429 U.S. at 495, 97 S.Ct. 711. Thus, under the totality of the circumstances the interview was noncustodial, and the incriminating statement was properly admitted even though Protsman was never read his *Miranda* rights.

## III.

For the foregoing reasons, we **AFFIRM** the district court's conclusion that Protsman was not in custody, and we **AFFIRM** the judgment of the district court.