**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0771n.06
Filed: November 1, 2007

**No. 06-2193**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| EDWARD H. TEGELER, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| PAUL RENICO, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |

Before: MARTIN, GIBBONS, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Edward H. Tegeler appeals the denial of his habeas corpus petition. Because the district court properly rejected Tegeler's claims, we affirm.

I.

In the early morning hours of July 18, 1998, James Smith was shot and killed at the Seven Hub Bar, an establishment he owned in Detroit, Michigan. Wayne County Police suspected that Edward Tegeler killed Smith because Smith earlier had asked Tegeler's girlfriend, Theresa Bell, to take a trip with him to Las Vegas. Prosecutors charged Tegeler with first-degree felony murder and felony-firearm possession. After a preliminary examination, a magistrate judge bound Tegeler to stand trial on these two counts as well as on an added charge of first-degree premeditated murder. Although the magistrate orally charged Tegeler with premeditated murder, the charge was omitted

from the bindover document. The prosecutor filed an amended information to add the premeditated-murder count, and Tegeler was arraigned on all three counts. Tegeler pleaded not guilty to all three charges.

At the beginning of the trial, Tegeler's counsel expressed concern about his client's condition, noting that Tegeler "didn't look too good." JA 75. The trial judge shared counsel's concern, observing that, "as soon as [Tegeler] walked through that door, he didn't look right to me." *Id*. To determine whether Tegeler was competent to stand trial, the trial judge and Tegeler's counsel questioned Tegeler about his condition. In response, Tegeler said that he understood the questions and that he had a full comprehension of what was taking place. Satisfied with Tegeler's response, the judge directed the parties to proceed with jury selection.

After jury selection but before opening arguments, the trial judge again asked about Tegeler's condition. "I don't believe," the judge said, "that there's anything wrong with the defendant mentally. He does not seem not to be competent." JA 78. But the judge worried about Tegeler's physical condition, noting his "concern[ that] when [Tegeler] came through there, his complexion was very pale and he stumbled." *Id*. Tegeler's counsel answered that the defendant had a "blood pressure problem" and that "[a]pparently, he [hadn't] gotten his medication." *Id*. Though Tegeler "d[idn't] look good," JA 80, he responded "Yeah" to the questions "[D]o you feel okay today with this right now?," and "Are you all right?," JA 79. The judge nonetheless ordered a short recess to "get somebody over here" to "get his medication here right away." JA 80.

After the recess, the trial continued uninterrupted until the court allowed a break for lunch. During the afternoon session, the court observed that "Mr. Tegeler is looking much better . . . . Some color is coming back into his skin." JA 91. No one expressed any further concern about Tegeler's condition.

At the end of the second day of trial, the jury found Tegeler guilty of first-degree premeditated murder and felony-firearm possession. The court sentenced Tegeler to life imprisonment without the possibility of parole for the murder and a consecutive two-year prison term for the felony-firearm conviction.

Tegeler raised three due-process claims in his direct appeal: (1) he was incompetent to stand trial; (2) the trial court improperly instructed the jury; and (3) the first-degree premeditated-murder charge for which he was convicted was not listed in the indictment and was not included in the written bindover. The Michigan Court of Appeals affirmed, and the Michigan Supreme Court denied leave to appeal.

Tegeler filed a petition for a writ of habeas corpus, raising the same three issues. The district court denied the petition.

II.

The Antiterrorism and Effective Death Penalty Act (AEDPA) permits federal courts to grant habeas relief if the state court decision was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States."

28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

A.

Tegeler first presses the point that the state court should not have let him stand trial. "It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992). Competency to stand trial is "fundamental to an adversary system of justice," *Drope v. Missouri*, 420 U.S. 162, 172 (1975), and it requires that the defendant have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense," *id*. at 171. When there is "sufficient doubt" about a defendant's competency, a trial court should hold a hearing on the matter before proceeding. *Id*. at 180.

The Supreme Court has not quantified "sufficient doubt," and it has declined to identify "fixed or immutable signs" that demand further inquiry. *Id*. It instead has identified three common-sense guideposts: (1) Did the defendant behave irrationally? (2) What was the defendant's demeanor at trial? and (3) Did the defendant have a medical condition that might affect his competency to stand trial? *Id*. Because the question of competency "is often a difficult one in which a wide range of manifestations and subtle nuances [is] implicated," there is no one-pattern-fits-all formula for applying these factors to a given individual. *Id*.

Gauged by these inquiries, we agree with the Michigan Court of Appeals that the trial court did not commit error, much less the kind of error that would permit us to grant relief under AEDPA. Tegeler did not behave irrationally before or during trial, and he did not have a pre-existing medical condition that would raise red flags about his competency. The trial court also properly addressed the one red flag that did appear—Tegeler's demeanor at trial. When it noticed Tegeler's "woozy" appearance, the court inquired into his competency, directly questioning Tegeler about his physical condition. JA 76. Only after Tegeler affirmed that he "kn[ew] where [he was]" and that he "ha[d] a full comprehension" of the nature of the proceedings against him did the trial court find Tegeler competent and allow the trial to proceed. *Id*. Tegeler's counsel did not contest the trial court's assessment of Tegeler's competency, its decision to continue the trial or its judgment that a competency hearing was unnecessary.

Even then, moreover, the trial court did not stop at that. After this initial inquiry and after this initial assessment of Tegeler's competency, it continued to reassess Tegeler's condition, noting in the afternoon session of day one that "Mr. Tegeler is looking much better." JA 91.

Due process does not require more. It was not Tegeler or his counsel who first raised the issue of constitutional competency; it was the trial judge. And only after the trial court assured itself that Tegeler understood the nature of the proceedings and could participate in them did it allow the trial to continue. So far as the record shows, once the apparent problem of Tegeler's lack of medication was addressed, the defendant showed no more signs of physical stress. To the contrary, the court's later comments confirm that the problem was addressed and resolved. On this record,

Tegeler falls short of establishing a due process violation and well short of identifying an error that AEDPA would permit us to correct in the context of a federal habeas corpus petition.

B.

Tegeler next argues that the trial court violated his due process rights by failing to give a jury instruction on the lesser-included offense of voluntary manslaughter. Precedent forecloses this argument. "[T]he Constitution," we have held, "does not require a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *see also Bagby v. Sowders*, 894 F.2d 792, 796–97 (6th Cir. 1990) (en banc).

Tegeler responds that "[f]ederal law on this issue is in flux." Br. at 24. What Tegeler means by this is not entirely clear. There is no fluctuation in Sixth Circuit precedent on the point. *Campbell* addresses, and rejects, the same argument. Tegeler's invocation of language from *Paulding v. Allen*, 393 F.3d 280 (1st Cir. 2005), does not support him. Not only does *Paulding* come from another circuit, but the language upon which Tegeler relies—"the most that a noncapital defendant could assert under the Supreme Court's precedent is that a lesser included offense instruction is required if warranted by the evidence," *id.* at 283—also is *dicta* because the court proceeded to hold that the state courts "reasonably determined that the evidence did not warrant such an instruction," *id.* at 284. And Tegeler's own reading of Supreme Court precedent does not help him because it conflicts with our decision in *Campbell*.

Tegeler may be right that it is unusual to have the requirements of due process turn on the penalty at stake, not the charge. But that it is an inevitable consequence of treating capital cases differently from other criminal cases—a difference that does not help Tegeler but assuredly provides some solace to other criminal defendants.

Even if we were to agree with Tegeler that federal law on this issue is unsettled, that would not help his claim. An argument based on an "open question in [the Supreme Court's] jurisprudence" necessarily does not show that the state courts violated "clearly established Federal law, as determined by the Supreme Court," *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006), and he has not cited any case law to show that the state courts unreasonably applied Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1).

C.

Tegeler's final argument subsumes two related points: (1) the trial court lacked jurisdiction to try him for first-degree premeditated murder because the bindover order did not list that charge, and (2) the jury convicted him of a crime for which he was not charged.

Tegeler's first point turns on a violation of his *state* statutory rights. Even if that allegation had force, it would not by itself permit us to grant relief. "We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Nothing Tegeler has argued on appeal alters that conclusion. Because Michigan law requires a charge to be included in the bindover order, he claims that the trial court lacked jurisdiction to try him on the omitted premeditated-murder charge, making him eligible for habeas relief. Putting to one side the question of whether any state law error occurred (the Michigan Court of Appeals persuasively concluded that it did not), Tegeler's claim still turns on a violation of state, not federal, law. Tegeler's petition asks us to reverse a state court ruling on a state law issue, *see* Br. at 28 ("[T]he procedure herein . . . violated state law. . . . Accordingly . . . it falls to the Federal Courts to deliver the remedy."), which is not a traditional premise for federal habeas relief.

Nor does he begin to show how this alleged violation of state law affected his rights under the Federal Constitution. Rather than identifying a "life, liberty, or property" interest created by state law, *see Meachum v. Fano*, 427 U.S. 215, 223 (1976), and showing how Michigan did not give that interest the process to which it was due, Tegeler's claim starts and ends with the complaint that the State violated its own procedural rules. Because "[p]rocess is not an end in itself," *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983), that theory of relief does not suffice, *see Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981).

Even if Tegeler could identify a cognizable life, liberty or property interest, his claim would still fail. Although a criminal defendant has a due process right to "fair notice of the charges against him to permit adequate preparation of his defense," *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988), a charging document that "fairly but imperfectly informs the accused of the offense for which

he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings," *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986) (per curiam).

Tegeler had fair notice of the charges against him. The magistrate issued an oral order charging Tegeler with the premeditated-murder count, and the prosecutor amended the information prior to Tegeler's arraignment. Tegeler, indeed, does not dispute that he had notice and was informed of the charges brought against him. Br. at 26 ("[T]here is no question that the examining magistrate did make oral findings which would have supported bindover on a premeditated murder charge."). No constitutional violation occurred under these circumstances.

III.

For these reasons, we affirm.