NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0543n.06

No. 09-3939

FILED

*May 29, 2012*

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ANTHONY MASON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| TIMOTHY BRUNSMAN, Warden, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before:     MARTIN and GIBBONS, Circuit Judges; STEEH, District Judge.[*]

GEORGE CARAM STEEH, District Judge.  Petitioner Anthony Mason appeals the district court's denial of his petition for a writ of habeas corpus.  Three issues were certified for this appeal. Specifically, Mason claims the trial court erred by failing to suppress his taped statements in violation of his *Miranda* rights, and by failing to give a jury instruction as to the lesser included offense of voluntary manslaughter when Mason faced the death penalty.  Mason also claims he was denied due process when the prosecutor vouched for the credibility of the state's key witness and denigrated Mason's defense counsel during closing argument.  For the reasons that follow, we **AFFIRM**.

---

[*] The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. BACKGROUND

Mason and Angela Turley were involved in a romantic relationship on and off for about two years. Angela lived with Mason in Northern Kentucky until February of 2003 when she moved in with her mother, Janie Turley, who lived in Hamilton, Ohio. On February 20, 2003, Angela obtained a domestic violence protection order against Mason. Thereafter, on March 18, 2003, Angela swore out an affidavit that Mason violated the protection order and a hearing was scheduled for May 14, 2003. The day before the scheduled hearing Mason went to Angela's apartment where a struggle ensued resulting in her death.

At trial Janie testified that when she pulled into her apartment complex's parking lot on May 13, 2003, Mason was standing there. He told her he had the $500.00 he owed Angela. Mason followed Janie into the building and when she opened the front door to her apartment, he forced his way in causing Janie to fall to the ground. As she tried to get up, she saw Mason point a gun at Angela, who began struggling for the gun. This is when the first shot went off. Janie tried to help Angela, but Mason hit Janie in the head with the gun, stunning her momentarily. Janie then saw Mason push Angela to the ground; he held her down with his left hand and pointed the gun at her head. Janie heard two shots fire. The paramedics and police arrived shortly thereafter and found Angela just inside the doorway with a gunshot wound to the head. One .32 caliber bullet found seventeen inches inside the doorway was recovered. Janie told the officers that Mason shot her daughter.

The autopsy revealed the manner of death was a single gunshot wound to the head, with a fouling and stipling pattern of half an inch, indicating the gun was fired at close to intermediate range. The bullet entered the victim's head just above her right ear. Three bullets were recovered,

a .32 caliber bullet recovered from just inside the door, a .32 caliber bullet recovered from the victim, and a .32 caliber bullet recovered from Mason's left thumb during his surgery. A firearms specialist testified that the general characteristics of all three bullets suggest that all three had been fired from the same weapon.

Sergeant Ervin and Lieutenant Michael Jones from the Covington, Kentucky, police department were dispatched to 1222 Russell Street in reference to locating a suspect in a homicide. Ervin went to the house and spoke with the suspect's mother, Julia Tolliver, on the front porch. Tolliver opened the front door and said, "Anthony, come down here. The police are here for you." Ervin stood in the doorway with his gun unholstered and at his side. Mason came down from upstairs holding a bloody rag wrapped around his left hand. Ervin performed a pat down search of Mason, put him in handcuffs and had Officer James West transport him to St. Elizabeth Hospital North in Covington, Kentucky.

At the hospital, Mason was placed in a 10 by 6 room located adjacent to the emergency room. This room was normally used for the questioning of crime victims and contained a television and magazines. Detective Richard Webster of the Covington Police Department entered the room, identified himself as a police officer, pulled out a tape recorder and turned it on. Before any substantive questioning began, a nurse asked how Mason had arrived at the hospital. Webster responded, "[h]e's being detained right now for an investigation." Webster then began asking Mason questions about what happened to Angela. Webster informed Mason that Hamilton police officers would arrive "momentarily" and that they will "probably take you up to the Covington Police Department headquarters and sit down and talk to you up there."

Mason's taped statement concerning what occurred at Angela's apartment was markedly different than Janie Turley's rendition. Mason stated that Angela owed him $500.00 and told him earlier that day to come by the apartment because she had his money. At this point during the questioning, Webster inquired, "Now, before we go any further, do you understand what your rights are?" Mason responded that he knew he had the right to remain silent, the right to speak to an attorney and that anything he said can and would be used against him. Webster then said, "[t]hat's pretty close, how about if you cannot afford one, one will be appointed for you?" Mason responded that he understood his rights. Mason then said that when he entered the apartment, Angela appeared from the back bedroom and was holding a gun. She began yelling at him and fired the gun at him. Mason, Angela and her mother all struggled to get control of the gun. Mason heard a shot, panicked and ran.

During the interview, medical personnel were in and out of the room tending to Mason's injury. In the middle of the questioning, he was taken for an x-ray of his hand. Officer West, who was also present throughout the duration of Webster's questioning, accompanied him to the x-ray room. The questioning took approximately one hour.

Mason was later transported to St. Elizabeth South to have the bullet removed from his thumb. At approximately 8:00 p.m., Detective Jim Calhoun arrived, identified himself and administered *Miranda* warnings. Calhoun tape-recorded a second statement from Mason, which was identical to Mason's first statement. This second interview lasted twenty minutes. Mason was arrested and transported to the Kenton County Jail.

A Butler County grand jury indicted Mason in April of 2003 on one count of aggravated murder in violation of Ohio Revised Code § 2903.01(B), with three specifications (count 1); one

-4-

count of aggravated burglary in violation of Ohio Revised Code § 2911.11(A)(2), with one specification (count 2); and one count of felonious assault in violation of Ohio Revised Code § 2903.11(A)(2), with one specification. Under Ohio law, Mason faced a death sentence if convicted of the aggravated murder charge. Prior to trial, Mason's counsel, Gregory Howard and David Brewer, moved to suppress the two taped statements Mason gave to the police while at the hospital. Following a pre-trial suppression hearing, the trial court denied Mason's motion to suppress.

On April 26, 2004, the jury convicted Mason. He was sentenced to life imprisonment without the possibility of parole for aggravated murder, plus consecutive sentences for the felonious assault and weapons charges.

Mason's conviction and sentence were affirmed on direct appeal and his federal habeas corpus petition was denied. He appeals the denial of his petition for a writ of habeas corpus.

## II. DISCUSSION

### A. Standard of Review

In a habeas corpus action, this court reviews a district court's legal conclusions de novo and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999); *Miskel v. Karnes*, 397 F.3d 446, 451 (6th Cir. 2005). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to cases brought after its effective date. *See Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006) (citing *Woodford v. Garceau*, 538 U.S. 202, 210 (2003)). Under the AEDPA, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's decision "was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." *Id.* at 449 n.2 (quoting 28 U.S.C. § 2254(d) (internal quotation marks omitted)).

**B.      Fifth Amendment**

The Fifth Amendment states that an individual may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Therefore, the prosecution may not use a defendant's statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Thus, *Miranda* "requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued <u>prior to questioning</u> whenever a suspect is (1) interrogated (2) while in custody." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (emphasis in original).

Custodial interrogation occurs upon "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Whether a suspect is "in custody" is "determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Courts must consider "all of the circumstances surrounding the encounter." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (internal quotation marks omitted). The "totality of the circumstances" requires consideration of several factors including, but not limited to: (1) whether the defendant felt free to leave, (2) the purpose of the questioning, (3) whether the place of the questioning was hostile or coercive, (4) the length of the questioning, and (5) other indicia of custody. *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000); *see also*, *Panak*, 552 F.3d at 465.

-6-

This Court concludes that under the totality of the circumstances a person in the same situation as Mason would not have felt free to terminate the questioning and leave. The Ohio Court of Appeals's decision that Mason was not "in custody" for *Miranda* purposes was an unreasonable application of clearly established Supreme Court law. The Ohio Court of Appeals concluded that the "circumstances more closely resembled that of a simple interview" rather than a custodial setting based on the fact that there was no indication that Mason "was restrained in any way during the interview, or that he was at the hospital receiving treatment against his will."

The state court ignored the fact that Mason was placed in a small room with constant police supervision and was not allowed to walk anywhere, including when he was taken for an x-ray, without at least one officer accompanying him. Contrary to the state's argument, a television and a few old magazines do not transform a custodial setting into a non-custodial one. Even a person's bedroom, arguably one of the most comfortable of settings, can be transformed into a custodial environment. *See Orozco v. Texas*, 394 U.S. 324, 325-26 (1969); *Panak*, 552 F.3d at 466 ("Even when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual.").

In any event, Mason was not in this small room alone but was supervised by at least three armed officers at all times. That medical personnel were freely allowed to enter the room to treat Mason's injury is of no consequence. The constant police supervision coupled with the manner in which he arrived at the hospital, specifically being approached by Ervin with his gun drawn and being placed in the back of a police vehicle, demonstrates that his freedom was restrained to a degree

normally associated with formal arrest.[1]  *See Panak*, 552 F.3d at 466 (noting that "the conspicuous display of drawn weapons" is one factor that can lead a reasonable person to perceive the environment as "unduly hostile, coercive and freedom-restraining"); *see also Howard v. State*, 217 So. 2d 548, 549 (Ala. Ct. App. 1969) (finding the defendant was in custody when a city patrolman transported him to the hospital, "[w]e would be naive if we believed that Howard could have freely walked away from his lazeretto").

Webster never told Mason he could leave or that he could cease answering questions at any time.  To the contrary, he was informed that he was being detained for an investigation and would be taken to the police headquarters for further questioning.  Webster's comment that the Hamilton officers would arrive shortly to take him to headquarters for further questioning signaled to Mason that he could not leave until, at the very least, the other officers arrived at the hospital.  *See United States v. Protsman*, 74 F. App'x. 529, 534 (6th Cir. 2003).  In *Protsman*, this court ultimately concluded that under the totality of the circumstances Protsman, a felon, was not in custody when interviewed by police concerning a false statement he made in an attempt to procure a firearm.  Id. at 535-36.  Reviewing the totality of the circumstances, this Court found that "[t]he strongest factor in Protsman's favor . . . is that Protsman was told by police department personnel on two separate occasions that he had to go back to the police station and that he could not leave the station."  Id. at 534.  Specifically, this Court opined:

> While it is entirely possible for a reasonable person in Protsman's position to have believed he was not free to leave when the police department personnel told him that "he had to go back" to the station, and that he "could not leave," the interviewing

---

[1]  Because there is a factual dispute in the record concerning whether Mason was handcuffed during transport to the hospital, the court will not rely on this fact in evaluating the totality of the circumstances.

officer's subsequent statements at the beginning of the interview –that he was free to leave if he wanted–negated any idea that the interview was custodial in nature.

*Id.* at 535. *Protsman* supports this Court's conclusion that a reasonable person in Mason's situation would not have felt free to leave. Unlike the facts in *Protsman*, Mason was not "completely free to move about," nor told that he was free to leave and not going to be arrested. *Id.* Based on the totality of the circumstances, Mason was in custody and was entitled to *Miranda* warnings prior to providing his statement to Webster.

The Fifth Amendment precludes the prosecution from using a defendant's compelled statement in its case-in-chief. *See Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985). "The *Miranda* Court . . . presumed that interrogation in certain custodial circumstances is inherently coercive and that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forgo those rights." *Id.* at 305 (alteration omitted). The state attempts to rebut this presumption of coerciveness by arguing that Mason's statement to Webster was voluntary. While Mason's own recitation of his *Miranda* rights during Webster's questioning may have been sufficient to overcome the presumption of coerciveness, we need not decide this issue because the admission of Mason's statement was harmless error, precluding habeas relief under the AEDPA as discussed below.

A habeas court may not grant relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). ("[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." (internal quotation marks omitted)). While the Brecht court reasoned that some errors implicate constitutional process to such a degree

that reversal of a conviction is required without resort to harmless error analysis, trial errors, such as the one present here, are subject to harmless error analysis for purposes of federal habeas corpus review.  Id. at 638.  Trial error, as opposed to structural error, "occurs during the presentation of the case to the jury, and is amenable to harmless-error analysis because it may be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial."  Id. at 629 (alterations and internal quotation marks omitted).

Thus, habeas relief is warranted only if "the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict."  *Calderon v. Coleman*, 525 U.S. 141, 147 (1998).  If the habeas court is left with grave doubt about the likely effect the error had upon the jury's verdict, in other words if "the matter is so evenly balanced . . . as to the harmlessness of the error" the court "should treat the error, not as if it were harmless, but as if it affected the verdict."  *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Mason argues that the admission of his statements had a profound impact on the jury and injured his case because he confessed that (1) he was at the scene of Angela's death, (2) he tussled with Angela and her mother, and (3) Angela was shot during the struggle.  Also, the statement harmed his credibility; the jury may have determined he was not trustworthy, therefore concluding that he probably intentionally shot Angela.

In the context of the entire trial, the admission of Mason's statements did not have a substantial and injurious effect on the jury's verdict.  Even if the statements had been suppressed, the state's other evidence against Mason was compelling.  Janie Turley testified that Mason forced his way into her apartment, knocked her to the ground, hit her on the head with his gun, and pointed a gun at Angela while holding Angela's head with his left hand.  Janie Turley's testimony of what

-10-

transpired at her apartment the afternoon of May 13, 2003, was corroborated by the autopsy, which revealed that the manner of death was a single gunshot wound to the head, with a fouling and stipling pattern of half an inch, indicating that the gun was fired at close to intermediate range and that the bullet entered Angela's head above her right ear. Janie Turley's testimony was also corroborated by the testimony of the first responding officer's account of what the scene looked like when he arrived and how the victim was found. Further, the examination of the three .32 caliber bullets recovered by law enforcement revealed that all three bullets were fired from the same firearm. Lastly, Mason's bullet wound to his left hand supported Janie Turley's testimony that she witnessed him holding her daughter's head with his left hand and then she heard two shots fired. In short, admission of the statements did not have a substantial and injurious effect upon the jury's verdict. Mason is not entitled to relief on this claim.

### C. Trial Court Error in Failing to Give Instruction on Lesser Included Offense of Voluntary Manslaughter

Mason argues that the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter because he faced a death sentence as a potential penalty. Mason relies on the Supreme Court's holding in *Beck v. Alabama*, 447 U.S. 625 (1980) in support of his argument.

As a threshold matter, Mason's claim is procedurally defaulted because he failed to fairly and fully present this claim to the Ohio courts under AEDPA's exhaustion rule. While the state does not argue failure to exhaust as a defense, this Court may raise and consider the issue *sua sponte*. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). In order for Mason to be entitled to relief on his claim, he must have first "fully and fairly present[ed] his claim, as a matter of federal law, to

[the] state courts." *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)). The exhaustion rule does not require dismissal of the petition if the petitioner does not have a remedy available in the state courts. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996). Such an instance, the petitioner is said to have procedurally defaulted his claim. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994)

On direct review, Mason presented this claim only as a matter of state law, arguing that the evidence at trial was sufficient to warrant an instruction on voluntary manslaughter under Ohio law. Therefore, his federal claim is not exhausted. Further, Mason is foreclosed from raising this claim before the Ohio courts. Ohio's post-conviction statute requires that a defendant seeking relief file his petition within 180 days of the filing of the trial transcript in the court of appeals or the expiration of the time for filing the appeal, unless his claim is based on a newly recognized federal or state right applied retroactively pursuant to Ohio Revised Code § 2953.23. *See* Ohio Rev. Code 2953.21(A)(2). Further, a post-conviction petition is subject to dismissal if the claim could have been raised on direct appeal. *See Durr v. Mitchell*, 487 F.3d 423, 434 (6th Cir. 2007). *Beck* was issued in 1980, well before Mason's 2004 trial. Thus he could have "fully and fairly" presented his claim on direct appeal.

Even if Mason fully and fairly presented his *Beck* claim to the state courts, he is still not entitled to relief on this claim. *Beck* jury instructions are not required in non-capital cases. *See Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001). Here, Mason was charged with a crime punishable by death under Ohio law, but was sentenced to life imprisonment. Mason urges this court to reject the state's argument that this case should be treated as non-capital for Beck purposes. Courts addressing this question have concluded that where a defendant receives a life sentence

instead of a death sentence, the case is non-capital, and therefore *Beck* does not apply.  *See Creel v. Johnson*, 162 F.3d 385, 390 (5th Cir. 1998), cert. denied, 526 U.S. 1148 (1999); *Pitts v. Lockhart*, 911 F.2d 109, 112 (8th Cir. 1990), cert. denied, 501 U.S. 1253 (1991); *Trujillo v. Sullivan*, 815 F.2d 597, 602 (10th Cir. 1987), cert. denied, 484 U.S. 929 (1987).  This Court declined to address the same issue in *Drake v. Superintendent, Trumbull Corr. Inst.*, 106 F.3d 400, *9 (6th Cir. 1997) (table).

Moreover, Mason's admission that the Supreme Court itself has not addressed this issue forecloses the availability of a remedy under § 2254(d)(1).  *See Tegeler v. Renico*, 253 F. App'x. 521, 525 (6th Cir. 2007) ("An argument based on an open question in the Supreme Court's jurisprudence necessarily does not show that the state courts violated clearly established Federal law, as determined by the Supreme Court ."  (alteration and internal quotation marks omitted)).  Mason is not entitled to relief on this claim.

### D.  Prosecutor Misconduct

Mason argues that he was denied a fair trial because the prosecutor committed misconduct during closing argument when he improperly vouched for the credibility of the state's primary witness, Janie Turley, and denigrated defense counsel during rebuttal argument.  Specifically, the prosecutor argued that: "[W]hat we have in this case is credible, honest eyewitness testimony from a mother that saw her daughter's life taken right in front of her eyes, right in front of her in their home by this defendant.  That's direct evidence."  Petitioner also relies on the prosecutor's statement during rebuttal argument: "I'm not going to enrage anybody here, maybe Mr. Brewster thought I was going to, but maybe he shouldn't think."

The Ohio Court of Appeals concluded that Mason's counsel failed to object to the prosecutor's comments concerning Janie Turley's credibility; therefore the court reviewed this aspect

of his claim for plain error. The court determined that the prosecutor improperly vouched for the credibility of Janie Turley but concluded that the comment was not a miscarriage of justice. The court also concluded that the prosecutor's comment about defense counsel "went beyond what is acceptable, and was an improper attempt to lower defense counsel in the eyes of the jury." However, the court ultimately concluded that "in the context of the entire proceedings, we do not find the affect [sic] of the prosecutor's statement was to render appellant's trial unfair."

When a petitioner fails to comply with an adequate and independent state procedural rule when presenting a federal constitutional claim, the petitioner may be barred from federal court review of his claim. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). In Ohio, failure to raise a contemporaneous objection to error in the trial court "is an adequate and independent state ground to bar federal habeas review absent a showing of cause and prejudice." *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000) (citing *Engle v. Isaac*, 456 U.S. 107, 124-29 (1982)).

Here, the Ohio Court of Appeals clearly and expressly relied on counsel's violation of Ohio's contemporaneous objection rule in declining to review Mason's prosecutorial vouching claim. The state court's plain error review did not constitute a waiver of the procedural default. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Further, Mason cannot rely on a claim of ineffective assistance of trial counsel to excuse his procedural default because he never presented his ineffective assistance of trial counsel claim to the state courts and the time within which he could have raised this claim has expired. *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011) (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). Additionally, Mason has failed to demonstrate that a fundamental miscarriage of justice will occur if this Court declines to review his claim. *Murray*, 477

U.S. at 496. Mason does not identify any new and reliable evidence suggesting that he is actually innocent of the crimes for which he was convicted. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Even if Mason had not procedurally defaulted his prosecutor misconduct vouching claim, this comment, coupled with the prosecutor's derogatory remark about defense counsel, did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). In order for the court to grant a writ of habeas corpus, the misconduct "must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006). To satisfy this standard, the conduct must be both improper and flagrant. *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006).[2]

This court considers four factors to determine whether a prosecutor's conduct is flagrant. *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008). Specifically, the factors are: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* If this Court concludes that the prosecutor's conduct was not flagrant, it will grant a writ of habeas corpus only if: "(1) the proof against the defendant was not overwhelming; (2) opposing counsel objected to the conduct; and (3) the district court failed to give a curative instruction." *Id.* at 485.

Contrary to Mason's assertion, it does not appear that the prosecutor intended to improperly vouch for the credibility of Janie Turley. The sole remark occurred during the beginning of closing

_____

[2]    This Court will assume, without deciding, that the Ohio Court of Appeals's determination that both of the prosecutor's comments were improper was a reasonable application of clearly established Supreme Court law.

argument while counsel was explaining the difference between direct and circumstantial evidence. The prosecutor never again improperly vouched for Janie Turley's credibility. To the contrary, he acknowledged during rebuttal argument that Janie Turley's credibility was an issue for the jury to decide. Potential prejudice was mitigated by the trial court's instructions that the arguments of counsel are not evidence. Additionally, the prosecutor informed the jury during his closing "that what was said by counsel in opening statements and closing argument isn't evidence." The isolated prosecutor's remarks about Janie Turley's credibility did not mislead the jury about the evidence introduced at trial.

The prosecutor's comment that counsel "shouldn't think" was also isolated and was made in response to a remark made by defense counsel. Specifically, defense counsel argued: "The State has the final word in the case, so you are only going to have to think what I would have said in response to Mr. Hedric's statement. Now, he's going to try and enrage your passion and sympathy towards Janie Turley . . . ." After describing in detail how Janie Turley's testimony was corroborated by other evidence at trial, the prosecutor argued: "And it's all going to come down to whether you believe Janie Turley. Is she a liar? Don't feel sorry for her in your deliberations. I'm not going to enrage anybody here, maybe Mr. Brewer thought I was going to, but maybe he shouldn't think." While a prosecutor's "invited response" may be improper, the effect of the comment must be considered in the context of the trial as a whole. *Darden*, 477 U.S. at 182. Taken in context, the remark was made in an effort to demonstrate that Janie Turley's testimony supported the elements of the crimes beyond a reasonable doubt and that the jury should not rely on sympathy for her in reaching its verdict.

As previously described, the evidence against Mason was compelling. The prosecutor's isolated, seemingly unintentional remarks did not so infect the entire trial as to render it a denial of due process. Because this Court concludes that the prosecutor's conduct was not flagrant, a writ of habeas corpus may only be granted if there were no curative instructions given, the evidence presented was not overwhelming, and counsel objected to the conduct at issue. Because Mason does not meet this standard, a writ of habeas corpus is not warranted on this claim.

## III. CONCLUSION

The district court's judgment denying Mason's petition for a writ of habeas corpus is AFFIRMED.