*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0167p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CECIL C. JOHNSON, JR.,

        *Petitioner-Appellant,*

    *v.*

RICKY BELL, Warden,

        *Respondent-Appellee.*

No. 04-5377

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 99-00047—Robert L. Echols, District Judge.

Argued: March 15, 2007

Decided and Filed: April 29, 2008

Before: BATCHELDER, COLE, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** James G. Thomas, NEAL & HARWELL, Nashville, Tennessee, for Appellant. Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** James G. Thomas, James Franklin Sanders, NEAL & HARWELL, Nashville, Tennessee, for Appellant. Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

    GIBBONS, J., delivered the opinion of the court. BATCHELDER, J. (pp. 17-18), delivered a separate concurring opinion. COLE, J. (pp. 19-24), delivered a separate dissenting opinion.

---

## OPINION

---

    JULIA SMITH GIBBONS, Circuit Judge. In 1981, petitioner-appellant Cecil C. Johnson, Jr., was convicted by a Davidson County, Tennessee, jury of three counts of first degree murder, two counts of robbery, and two counts of assault. Johnson was sentenced to death for the murders and received four consecutive life sentences for the remaining convictions. The convictions and sentences were upheld by the Tennessee Supreme Court on direct appeal, and the United States Supreme Court denied Johnson's petition for a writ of *certiorari*. Johnson twice sought post-conviction relief in state court; both attempts failed. Johnson filed the instant petition in federal court in January 1999. The district court granted respondent's motion for summary judgment and dismissed the petition. This court granted a certificate of appealability on six issues. For the following reasons, we affirm the judgment of the district court.

1

I.

On July 5, 1980, Bob Bell's Market in Nashville, Tennessee, was robbed by an armed gunman. In the store at the time of the robbery were Bob Bell, Jr. (Bell), his son Bobbie, and Louis Smith, an acquaintance of Bell's. Bobbie Bell was helping at the cash register and Smith was working at the store repairing a motor for Bell. The assailant pointed a gun at Bell and ordered him and Smith behind the register where Bobbie Bell stood. While the captives were behind the counter, other customers entered the market. The gunman ordered the Bells and Smith to act naturally and attend to the customers. After the customers left, the gunman ordered Bobbie Bell to fill a bag with the money in the cash register.

Soon thereafter, the gunman began shooting. Bobbie Bell was shot first and later died from his wounds. After Bobbie Bell was shot, Smith threw himself on Bobbie in an effort to protect him from further harm. In the process, Smith was himself shot twice. The gunman then shot at Bell's head but, because Bell had lifted his hands, his wrist deflected the shot and Bell survived. As the gunman fled the market, he shot and killed two men—a cab driver and his passenger—who were sitting in a car parked near the entrance to the market. The cab driver was later identified as James Moore and the passenger as Charles House, a customer who had entered the market moments before the gunman began shooting his victims. Bell left the market and attempted to follow the gunman but was unable to do so successfully.

Information Bell gave to police officers immediately after the robbery led to Johnson's arrest on July 6, 1980. At trial, both Bell and Louis Smith identified Johnson as the perpetrator of the crimes. In addition, Debra Smith, a customer who entered the market during the commission of the robbery, identified Johnson as having been behind the counter with Bell, Bobbie Bell, and Louis Smith.

Johnson was also connected to the crimes by Victor Davis, a friend who had spent most of July 5, 1980, in the company of Johnson. During the course of the investigation, Davis made statements to the prosecution and defense that provided Johnson with an alibi. In essence, Davis said that he and Johnson were together continuously from roughly 3:30 p.m. on July 5 until approximately midnight and that at no time did they visit Bell's Market. However, the week before the trial, and after he was arrested on unrelated charges, Davis made a statement to the prosecution incriminating Johnson. At trial, Davis, who was promised immunity from prosecution for any involvement in the crimes committed at Bell's Market, confirmed his statements incriminating Johnson. According to Davis's testimony, he and Johnson left Franklin, Tennessee, at approximately 9:25 p.m. on July 5 and arrived in Nashville in the vicinity of Bell's Market shortly before 10:00 p.m. Johnson then left Davis's automobile after stating that he was going to rob Bell and was going to "try not to leave any witnesses."

Davis testified that he next saw Johnson some five minutes later near Johnson's father's house, which was roughly a block from Bell's Market. Davis stated that Johnson was carrying a sack and pistol and, when he entered Davis's automobile, Johnson said, "I didn't mean to shoot that boy." Johnson discarded the gun, which Davis later retrieved and sold the following day. Davis further testified that after he picked up Johnson, they drove directly to Johnson's father's house, arriving shortly after 10:00 p.m. There, in the presence of Johnson's father, Johnson took money from the sack, counted approximately $200, and gave $40 of this money to Davis. According to Davis, Johnson told his father that he and Davis had been gambling and that gambling was the source of the money.

Johnson testified on his own behalf and denied being in Bell's Market on July 5, 1980. His testimony as to the events of the day was largely in accord with that of Victor Davis, except for the time just before 10:00 p.m. Johnson testified that he never left Davis's automobile on the trip from

Franklin to Johnson's father's house in Nashville and that he arrived at his father's house shortly before 10:00 p.m. Johnson's father testified that Johnson arrived a few minutes before 10:00, just before the 10:00 p.m. news began.

After hearing all the evidence, a Tennessee jury convicted Johnson of three counts of first degree murder, two counts of assault with intent to commit murder, and two counts of armed robbery. The jury recommended that Johnson be sentenced to death on each count of first degree murder and to consecutive life sentences on each of the remaining counts. The trial court accepted this recommendation and imposed the death penalty. On direct appeal in 1982, the Tennessee Supreme Court affirmed Johnson's convictions and sentence. *State v. Johnson*, 632 S.W.2d 542 (Tenn. 1982). The United States Supreme Court denied Johnson's 1982 petition for a writ of *certiorari*. *Johnson v. Tennessee*, 459 U.S. 882 (1982). Johnson filed an application to stay the execution with the Tennessee Supreme Court in December 1982, pending the filing of a state petition for post-conviction relief, which was granted. In January 1988, the Tennessee Court of Criminal Appeals affirmed the trial court's judgment in part but reversed and remanded the case for a new sentencing hearing on the first degree murder convictions, based on error under *Caldwell v. Mississippi*, 472 U.S. 320 (1985).[1]

Both Johnson and the State filed applications to appeal to the Tennessee Supreme Court. The Tennessee Supreme Court reversed the appellate court's reversal, reinstated the death sentences, and affirmed the denial of relief on Johnson's claims in all other respects.[2] *Johnson v. State*, 797 S.W.2d 578 (Tenn. 1990). In September 1990, Johnson filed a petition for rehearing with the Tennessee Supreme Court, which was denied, as was Johnson's motion for leave to file a second petition for rehearing.

Johnson filed his first federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in February 1991. Shortly thereafter, Johnson received information pursuant to a request under the Tennessee Open Records Act suggesting that the prosecution may have suppressed exculpatory material evidence at trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court granted Johnson's request to add this *Brady* claim to his petition. In February 1995, while his first habeas petition was still pending, Johnson filed a second post-conviction petition in state court, which was denied by the trial court and affirmed by the state appellate court. Johnson requested permission to appeal to the Tennessee Supreme Court, and while his application was pending, the federal district court dismissed his first habeas petition without prejudice, pending the exhaustion of the claims he had raised in his second petition for post-conviction relief. In October 1998, the Tennessee Supreme Court denied Johnson permission to appeal. Johnson filed his current, second habeas petition in federal district court on January 25, 1999. The district court granted the government's motion for summary judgment on all ten of Johnson's claims.

## II.

This court reviews *de novo* a district court's decision to grant or deny a petition for a writ of habeas corpus. *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004). Because Johnson filed his habeas petition on January 18, 1999, this appeal is governed by the provisions of the Anti-Terrorism

---

[1] The Court of Criminal Appeals found that the jury's death penalty sentence was invalid because the prosecutor improperly attempted to minimize the role and responsibility of the jury in imposing the death penalty. *Johnson v. State*, No. 83-241-III, 1988 WL 3632, at *13 (Tenn. Crim. App. Jan. 20, 1988).

[2] The Tennessee Supreme Court found that the prosecutor did not attempt to minimize the jury's degree of responsibility, as the appellate court had found, and that Johnson could not benefit from retroactive application of the new constitutional rule established in *Caldwell*, as Johnson's conviction had become final before the *Caldwell* decision. *Johnson v. State*, 797 S.W.2d at 580.

and Effective Death Penalty Act of 1996 (AEDPA). *Woodford v. Garceau*, 538 U.S. 202, 210 (2003). Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a claim that was adjudicated on the merits in State court proceedings only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state-court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 407-08, or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," *id.* at 407. Under 28 U.S.C. § 2254(e)(1), a state court's determination of a factual issue is presumed correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. This presumption also applies to the factual findings that the state appellate court makes on its review of the state trial record. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Mason v. Mitchell*, 320 F.3d 604, 614 (6th Cir. 2003).

III.

This court granted a certificate of appealability for the following issues: (1) whether the prosecution's failure to disclose material evidence violated Johnson's constitutional rights; (2) whether the prosecution violated Johnson's right to compulsory process by improperly coercing a defense witness; (3) whether the prosecution committed misconduct by improperly interfering with defense witness Victor Davis; (4) whether the prosecution committed misconduct by improperly vouching for a witness's credibility and inflaming the passions of the jury during closing argument; (5) whether the cumulative prosecutorial misconduct resulted in a violation of Johnson's constitutional rights; and (6) whether Johnson's trial counsel rendered ineffective assistance during the guilt phase by not moving for a continuance in light of certain pretrial developments and by not seeking the recusal of the prosecutors after they participated in the conversion of Victor Davis to a prosecution witness. We address these issues in turn.

A.

We first consider whether the prosecution's failure to disclose material evidence violated Johnson's constitutional right to due process. After filing a request for information under the Tennessee Open Records Act in 1992, Johnson received several police and medical reports that were not previously provided to him, which he contends undermine the credibility of certain witnesses. Johnson asserts that the following documents were exculpatory and withheld by the prosecution: (1) a July 6, 1980, report prepared by Detective Jerry Moore of the Metropolitan Police Department concerning his interview of Bob Bell; (2) a July 11, 1980, report of Officer J. Dobson concerning his interview of Louis Smith; (3) a July 5, 1980, report of Detective William Flowers concerning his interview of Louis Smith; (4) a July 5, 1980, report of Officer John Patton concerning his interview of Louis Smith; (5) a pleading filed by the defense in *State v. Louis Edgar Smith*, No. C6175-A, which was received by the Davidson County District Attorney's office on approximately November 11, 1980; (6) a July 6, 1980, report prepared by Detective William Robeck concerning his interview of Louis Smith; and (7) a "History of Physical Examination" report prepared by Robert Stein, M.D., concerning his examination of Bob Bell at Baptist Hospital on July 5, 1980.

Johnson contends that the decision of the Court of Criminal Appeals with respect to the documents was contrary to the Supreme Court's decisions in *Brady* and *Kyles v. Whitley*, 514 U.S. 419 (1995). The Court of Criminal Appeals identified *Brady* as the controlling authority and relied

on *United States v. Bagley*, 473 U.S. 667 (1985), and, to a lesser extent, *Kyles* for the standard for determining materiality in a *Brady* claim. *See State v. Johnson*, 1997 WL 738586, at *4. The Court of Criminal appeals concluded that the evidence was indeed exculpatory but, viewed collectively, it was not material. *Id.* at *4-8. Because the Tennessee Court of Criminal Appeals rejected Johnson's *Brady* claim on the merits, *id.*, the deferential AEDPA standard applies. *See Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[3] 373 U.S. at 87. To assert a successful *Brady* claim, a habeas petitioner must show that: (1) evidence favorable to the petitioner, (2) was suppressed by the government, and (3) the petitioner suffered prejudice. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

We proceed directly to the issue of prejudice, or materiality,[4] which is determinative of the *Brady* claim. Favorable evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Strickler v. Greene*, 527 U.S. 263, 289-90 (1999). The materiality requirement is not a sufficiency of the evidence test; the defendant need not demonstrate that disclosure of the suppressed evidence would have resulted in acquittal. *See Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Further, we conduct our review mindful of the Supreme Court's instruction that "suppressed evidence [must be] considered collectively, not item by item," when addressing the prejudice question. *Kyles*, 514 U.S. at 436; *see also Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003).

Johnson's *Brady* claim centers on the use of the withheld material to impeach three witnesses who testified at his trial: Bob Bell, Louis Smith, and Debra Smith. As noted previously, seven documents are at issue, five of which relate to Louis Smith. Smith was working at Bell's Market at the time of the robbery and testified about the events that occurred that day. Smith's testimony corroborated the testimony of Bob Bell and provided details regarding the facts and time sequence of the robbery. He remembered a few customers entering and leaving the market but stated that he did not take close note of the customers because he was focused on the assailant. He was uncertain about the number of customers and their gender but thought that there were two or perhaps three—two men and a woman, perhaps with a child. Smith said he really did not remember about the customers "for sure" and doubted that he could identify any of them except the last one. At trial, Smith identified Johnson in court as the perpetrator of the robbery and murders. He further testified that the assailant was a black male approximately 5' 8" and 160 pounds. Smith also testified that, while he was in the hospital, he picked two photographs from a photo array that closely fit his description of the assailant.[5] Additionally, he testified that he later viewed a lineup at the police

---

[3] We note the *Kyles* Court's iteration of Justice Blackmun's statement in *Bagley* that "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense. We have never held that the Constitution demands an open file policy . . . and the rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate." 514 U.S. at 436-37 (internal citations omitted).

[4] "Demonstrating prejudice requires the defendant to show that the suppressed favorable evidence at issue is material." *United States v. Jefferson*, 134 F. App'x 52, 54 (6th Cir. 2005) (citing *Strickler*, 527 U.S. at 282)).

[5] Smith did not testify that the individual in either of the photographs was Johnson.

department. Because police had told him to mark the card only if he was certain of his identification, he did not do so. He verbally identified number two for police, however, noting that the curled hair differed from that of the robber.[6] Johnson's counsel questioned Smith about a prior statement that the robber had no facial hair.

The five documents relating to Louis Smith include: (1) a July 5, 1980, report of Detective William Flowers concerning his interview with Smith; (2) a July 5, 1980, report of Officer John Patton concerning his interview with Smith; (3) a July 11, 1980, report of Officer J. Dobson concerning his interview of Smith, which apparently occurred on July 5, 1980; (4) a July 6, 1980, report of Detective William Robeck concerning his interview with Smith; and (5) a request for continuance of a November 11, 1980, trial date and notice of insanity defense filed on Smith's behalf in a criminal case in which Smith was charged with an offense occuring prior to July 5, 1980. The Flowers report indicates that Smith said he could not describe the suspect at that time but was willing to be interviewed again later, while Patton states that Smith says he did not get a good look at the suspect. Dobson says in his report that Smith, who was in a great deal of distress and "near death," identified the suspect as a young black male but indicated that he could not see his face. The Robeck report indicates that Smith picked out photos five and six from the photo display shown to him in the hospital.[7] Robeck also uses masculine pronouns to refer to two customers whom Smith told him entered the store during the robbery. The pleading in Smith's criminal case gives defense counsel's opinion that there was a "reasonable probability" that the most appropriate defense in the case would be either insanity or diminished capacity.

Certainly, the officers' reports would have assisted Johnson's cross-examination of Smith at trial, calling into question Smith's identification of Johnson and his ability to recall the events of the evening of July 5. Their contribution would have been limited, however, for several reasons. All of them were taken at a time when Smith could hardly have been expected to describe the events of the evening of July 5 with detailed clarity; Smith was in the hospital and "in distress" with gunshot wounds in his neck and hand. Moreover, defense counsel was able to successfully impeach Smith about identification of Johnson and his recollection of the events of the evening, based on the information he did have. Smith admitted that by the time he verbally identified Johnson at the police department, he had seen Johnson on television in connection with his arrest. He was uncertain in his responses to the questions about facial hair. His testimony did not suggest that Johnson was one of the individuals he identified from the earlier photo lineup in the hospital. And Smith conceded that he was not sure about the number of customers who entered the store and their gender and likely could identify only one of them. Given Smith's testimony and other eyewitness identifications of Johnson, the overall impeachment value of these reports, viewed collectively, is fairly minimal.

With regard to the notice of insanity defense filed in Smith's criminal case, this document has no value as impeachment material. Assuming that cross-examination about it would have been permitted, doubtless questioning would also have elicited the information that a psychiatric examination of Smith failed to support the claimed defense.[8]

The two remaining withheld items relate to Bob Bell. In the undisclosed July 6, 1980, statement given to Detective Moore the morning after the robbery and while Bell was still

---

[6] Person number two was in fact Johnson, who apparently had placed his hair in curlers for the lineup.

[7] Photograph four was the photograph of Johnson.

[8] Moreover, as this document was publically available, it simply does not present a *Brady* issue. *See Bell v. Bell*, 512 F.3d 223, 235 (6th Cir. 2008) (en banc).

hospitalized, Bell indicated that the assailant had no facial hair. Because Johnson's mug shot taken one day after the robbery revealed that he had some facial hair,[9] Johnson's counsel questioned Bell on the issue of Johnson's facial hair, even though he was unaware of Bell's statement to Moore. Bell testified that he focused on the assailant's eyes during the robbery and noticed nothing distinctive about his facial hair. The second relevant document is a medical report, completed the night of the murders, which contained a single statement noting that Bob Bell's medical history indicated "some mental instability." This statement provides little information, and any impeachment value would have been slight. We also note that Bob Bell was an extremely sympathetic witness and any cross-examination regarding his mental health would by necessity have been delicate at best. Bell had just seen his son murdered, was already familiar with Johnson, and had considerable interaction with the assailant during the course of the robbery. These factors would have minimized any impeachment value stemming from either Bell's statement to Detective Moore or the withheld medical report. Moreover, after the robbery, Bell identified Johnson as the perpetrator on four separate occasions. Bell also identified Johnson at trial and stated that he knew Johnson as a customer who had frequented his market in the past. As a consequence, even in light of the withheld evidence, Bob Bell's testimony remains persuasive.

Finally, Johnson argues that Detective Robeck's July 6, 1980, report could have been used to impeach Debra Smith, the customer who entered the store during the robbery and the state's third eyewitness. Ms. Smith, no relation to Louis Smith, testified that she went to Bell's Market on the day of the robbery between 9:30 p.m. and 9:50 p.m. According to her testimony, Debra Smith entered the market alone while Johnson was in the store, recognized him on the basis of their prior acquaintance, and was aware that a robbery was ongoing but nevertheless purchased a soft drink and then returned home. Other than informing her boyfriend and sister of the robbery, Smith did not communicate her knowledge of the incident until contacted by the police on July 15, 1980. At trial, Smith explained that she chose not to report her experience because she knew Johnson and wished to remain uninvolved. As mentioned above, Robeck's report implies that Louis Smith referenced only males entering the market, thus potentially calling into question whether Debra Smith ever entered Bell's Market on the evening of the robbery. Putting aside the evidentiary difficulty of impeaching Debra Smith with the statement of Louis Smith made to Robeck, we note that Debra Smith's testimony was already relatively weak, as it was marked by inconsistencies and statements that called her veracity, or at least the accuracy of her memory, into question. Among other things, Smith contradicted herself by describing Louis Smith as both African-American and Caucasian in her testimony. Johnson's counsel also significantly impeached Smith's contention that she was quite familiar with Johnson and his family. We find that any further impeachment of Ms. Smith would have had little, if any, impact on her persuasiveness with the jury.

The thrust of Johnson's argument is that the decision of the Court of Criminal Appeals is contrary to *Kyles*. Johnson argues that the testimony of two witnesses in *Kyles* remained untainted by the *Brady* violations, while the *Brady* material in this case impeaches all three primary witnesses, thus making his an "easier" case than *Kyles*. Such a numerical comparison alone tells us little about whether the suppressed evidence, when viewed collectively, undermines confidence in the verdict. The suppressed evidence in *Kyles* far exceeded that suppressed here as measured both by quantity and exculpatory persuasiveness. In *Kyles*, the withheld evidence strongly indicated that "Beanie," the primary informant who led investigators to Kyles, had actually planted the incriminating evidence. *Kyles*, 514 U.S. at 425-32. Beanie also fit the physical description given by other eyewitnesses and was the primary suspect in another recent murder involving the same *modus operandi*. *Id.* Finally, the withheld evidence established that the six eyewitnesses gave substantially

---

[9]The Tennessee Court of Criminal Appeals described Johnson's facial hair as "a faint mustache and a goatee." *State v. Johnson*, 1997 WL 738586, at *5. Johnson's mug shot, included in the appellate record, confirms this characterization.

different physical descriptions of the assailant at the scene of the crime, only one of which roughly matched Kyles. *See id*. at 423-28. Here, three eyewitnesses separately identified Johnson as the perpetrator of the crimes.[10] In sum, this is not a case where, as in *Kyles*, substantial withheld evidence indicated that another person, not the defendant, was in fact the guilty party.

A defendant proves a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In this case, the suppressed evidence, viewed collectively, does not so undermine our confidence in the verdict as to be "material" for *Brady* purposes. We therefore conclude that the decision of the Tennessee Court of Criminal Appeals was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. We affirm the district court's grant of summary judgment to the respondent on this claim.

B.

We next consider Johnson's contention that the prosecution committed misconduct and violated his right to compulsory process by improperly coercing defense witness Victor Davis.[11] Victor Davis was originally scheduled to be Johnson's principal alibi witness at trial. After the robbery, Davis told defense investigators and the police that he was with Johnson the entire day of July 5, 1980, and that Johnson did not have an opportunity to commit the murders. In his statements shortly after the incident, Davis made no mention of Johnson's discussing his intention to rob Bell's Market or any statement by Johnson regarding the murders or their aftermath. District Attorney General Sterling Gray testified that, in early January 1981, he spoke with Davis's attorney and police officer Gordon Larkin about speaking with Davis before commencement of Johnson's trial. Larkin testified that on the afternoon of January 9, 1981, he told police officer John Patton that Gray wished to talk with Davis.[12] Near midnight that evening, Patton arrested Davis for public drunkenness and carrying a weapon. Patton testified that Davis was one of three unknown males who were stopped because of suspicious behavior near a gas station that had been robbed in the past. Patton further testified that he recognized Davis only after Davis attempted to leave the stopped car while Patton was questioning the driver. At trial, Davis acknowledged that he had been drinking alcohol and smoking marijuana that evening.

Patton arrested all three men and took them for booking. On the ride downtown, Patton called Larkin on the police radio and asked Larkin if he still wanted to talk to Davis. At approximately 1:00 a.m. on January 10, 1981, Larkin met Patton at the booking room and took Davis with him to the District Attorney's office, where Gray and a criminal investigator were waiting. Davis testified that he was interrogated for approximately three and one-half hours that morning. After initially requesting his attorney, Davis withdrew the request after being told that he was being questioned only about Johnson, not unrelated burglary and robbery charges that were also pending against Davis. During this interrogation, Davis gave incriminating details related to Johnson's involvement in the Bell's Market murders. Davis returned to Gray's office with his attorney on Monday, January 12, 1981, and provided Gray with a detailed statement. During this January 12 meeting, Gray offered Davis immunity from prosecution for crimes related to the Bell's Market

---

[10]We also note that the testimony of these three witnesses was strengthened by the testimony of Victor Davis, which provided a detailed description of Johnson's activities on July 5, 1980, and placed Johnson at Bell's Market during the time of the murder. Davis's testimony was not affected by the documents that form the basis of the *Brady* claim.

[11]Both the compulsory process and misconduct issues concern whether the prosecution improperly coerced or interfered with defense witness Victor Davis. We therefore address these claims together.

[12]Patton knew Davis because he had previously arrested him on an unrelated matter.

incident if he would testify in court. On January 21, 1981, the State dismissed the weapons possession and public drunkenness charges against Davis.

Johnson maintains that the state courts never addressed the merits of this claim. To the contrary, both the Tennessee Supreme Court (on direct appeal) and the Tennessee Court of Criminal Appeals (on post-conviction review) addressed the claim and determined that the questioning of Davis was not coercive. Specifically, the Tennessee Supreme Court found that the fundamental claim being asserted was that Victor Davis's constitutional rights—not Johnson's—had been violated. *State v. Johnson*, 632 S.W.2d at 546. As a consequence, Johnson lacked standing to challenge any such alleged violation. *Id.* ("Even if the law enforcement officials violated Davis's [constitutional] right[s] . . . these are rights personal to Davis and can only be asserted by him and not by some other person, such as [Johnson], who might be adversely affected by information elicited during the detention and interrogation."). The Tennessee Court of Criminal Appeals arrived at the same conclusion. *See Johnson v. State*, 1988 WL 3632, at *8-9 (finding both that the Tennessee Supreme Court had already addressed the question and that Davis did not change his testimony in response to threats and intimidation but instead "was arrested legitimately for offenses unconnected with the petitioner's charges . . . [and Davis's] recanted testimony was freely given"). The deferential AEDPA standard therefore applies, the state courts' determination of factual issues is presumed correct, and Johnson bears the burden of rebutting this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Hill*, 400 F.3d at 313.

The Supreme Court has recognized that a party's right to present his or her own witnesses in order to establish a defense is a fundamental element of due process.[13] *Washington v. Texas*, 388 U.S. 14, 19 (1967). Government conduct that rises to the level of substantial interference with a witness's "free and unhampered determination to testify" violates this right. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997). Johnson contends that Davis's testimony was coerced as a part of the pretrial arrest and questioning—which deprived him of his primary defense witness—and this constituted a denial of compulsory process under *Washington* and *Webb v. Texas*, 409 U.S. 95 (1972).[14]

Johnson fails to show how the Tennessee state court decisions are contrary to, or an unreasonable application of, Supreme Court precedent. Johnson relies exclusively on *Washington* and *Webb*, which are easily distinguished. In *Washington*, the Court found that a Texas statute violated the defendant's right to compulsory process by "arbitrarily den[ying] him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Washington*, 388 U.S. at 23. Here, there is no indication that Davis was ever prevented from testifying on Johnson's behalf. Rather, he chose of his own accord to testify for the government. Although the *Washington* Court articulated the basic parameters of a defendant's compulsory process rights, nothing in the opinion is directly contrary, or even related, to Johnson's experience. *See id.* at 19 (noting generally that "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the

---

[13] The right to compulsory process is applicable to the states through the Fourteenth Amendment. *Washington*, 388 U.S. at 18-19.

[14] Johnson characterizes the prosecution's treatment of Victor Davis as both a violation of his compulsory process rights and a "stand alone" instance of prosecutorial misconduct. Johnson addresses both claims together and does not provide a separate legal analysis for his misconduct claim with regard to Victor Davis. He does, however, include this allegation in his cumulative prosecutorial misconduct claim. Because we find that the prosecution's treatment of Victor Davis did not constitute misconduct, it has no impact on our consideration of Johnson's cumulative misconduct argument, as discussed more fully below.

defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies").

*Webb* is similarly inapposite. In *Webb*, the defendant called his only witness, Leslie Mills, but before Mills could testify, the court of its own initiative admonished the witness of the consequences of perjury, including stating that "the Court will personally see that your case goes to the grand jury and you will be indicted [and you will likely] get convicted of perjury and [it] would be stacked onto what you have already got." *Webb*, 409 U.S. at 95-96. The *Webb* Court concluded that the witness was willing to testify on the defendant's behalf, but was dissuaded solely by the comments made by the trial court. *Id.* at 97. The Court found that "[i]n the circumstances of this case . . . the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id.*

Johnson contends that the prosecutors' treatment of Davis differs in no material respect from the treatment Mills experienced. We disagree. Davis's detention was for an unrelated crime and was the product of a lawful arrest. The record confirms that Davis knowingly and voluntarily waived his right to counsel when he learned that the January 10, 1981, interrogation would be limited to the Bell's Market incident. Two days later, Davis and his attorney went to the office of the district attorney, where Davis repeated his statement in the presence of his counsel, reduced the statement to writing, and signed it as true. Moreover, Davis testified at trial and both parties were able to explore the circumstances of Davis's arrest, detention, and testimony implicating Johnson. The defense was able to question Davis fully about his earlier statements exculpating Johnson. The jury was free to consider the circumstances of Davis's statements, which, presumably, informed its evaluation of Davis's credibility. This bears no resemblance to the trial court's overt threats and insinuations in *Webb*.

We cannot say that the prosecutorial conduct here substantially interfered with Davis's free and unhampered discretion to testify as he saw fit. *See Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2005) (interpreting and applying *Webb*). We therefore find that the decisions of the Tennessee courts were not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court, and therefore this claim fails.

C.

Johnson also contends that multiple instances of misconduct on the part of the prosecutor violated his due process right to a fair trial. This court granted a certificate of appealability on the following issues, all related to prosecutorial misconduct: (1) whether the prosecutor committed misconduct by improperly interfering with defense witness Victor Davis; (2) whether the prosecutor committed misconduct by improperly vouching for a witness's credibility and inflaming the passions of the jury during closing argument; and (3) whether the cumulative prosecutorial misconduct resulted in a violation of Johnson's constitutional rights. With respect to the cumulative prosecutorial misconduct claim, Johnson asserted two further issues in his request on this issue: the State improperly concealed the identity of Debra Smith as a government witness, and the State misrepresented the time of the offense.

The relevant question in analyzing a claim for prosecutorial misconduct on habeas review is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). To satisfy this standard, the conduct must be both improper and flagrant. *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006); *see also Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (noting that reversal is required if the prosecutor's misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice

the defendant") (internal citation omitted). If conduct is found to be improper, four factors are then considered to determine whether the conduct was flagrant and therefore warrants reversal: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

Because we previously addressed the prosecution's alleged interference with Davis, we turn now to the remaining issues.

1.

Johnson contends that the prosecutor improperly vouched for Victor Davis's credibility. "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Improper vouching typically involves either blunt comments or some implication that the prosecutor has special knowledge of facts not before the jury related to the credibility of a witness. *Id.* Johnson asserts that various statements made by the prosecution in its direct examination of Victor Davis constituted improper bolstering of the Davis's credibility. *See id.* ("Bolstering and vouching are much alike and go to the heart of a fair trial. Bolstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury.").

The district court found that significant portions of Johnson's claim were defaulted, and we agree. This court has explained the doctrine of procedural default as follows:

> When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.

*Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000). On direct appeal, Johnson's brief to the Tennessee Supreme Court raised objections only to five allegedly leading questions. When Johnson filed his petition for post-conviction relief with the Tennessee Court of Criminal Appeals, he nevertheless cited the same twenty-one allegedly leading questions that he would later cite in his federal habeas petition. The Court of Criminal Appeals held that Johnson's additional claims were defaulted. *Johnson v. State*, 1988 WL 3632, at *8 (finding that the claims had "been previously determined or waived and [are] therefore foreclosed from review in a post-conviction proceeding [under] Tenn. Code Ann. § 40-30-112"). Accordingly, we find that the appellate court did indeed rely on Johnson's failure to comply with state procedural rules in denying review. *See Harris v. Reed*, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (internal quotation marks omitted). The Tennessee Supreme Court—also relying on Tenn. Code Ann. § 40-30-112—found that Johnson had raised twenty-six issues on appeal, all of which were either previously determined or waived due to failure to present them at trial or on direct appeal.[15] *Johnson v. State*, 797 S.W.2d at 582. Like the district court, we find that, with the exception of the five objections made on direct appeal, Johnson's objections were procedurally defaulted.

---

[15] The Tennessee Supreme Court found that the intermediate appellate court "properly reviewed, considered and dealt with [these issues] appropriately." The Court reversed on grounds not before this court.

As mentioned, Bell's claims as to certain statements were adjudicated by the state courts on the merits and exhausted and therefore are properly before this court. Those include the following statements made by District Attorney General Gray during his questioning of Davis on direct:

> Gray: Tell the jury what I told you Mr. Johnson [sic - Davis], Saturday morning.
>     . . .
> Gray: What did I say to you about this case in terms of what you knew when I talked to you?
>     . . .
> Gray: Now, on Monday, of this week you came to our office with you [sic] attorney, is that correct? . . . At that time you sat down and gave us a detailed statement of what you have just told the jury, right?
>     . . .
> Gray: Prior to doing that on Monday I told you that you had immunity in this case if you would testify, is that correct . . . if you told the truth about what you knew about it, is that right?

Finally, during closing argument, Gray stated:

> [B]ecause I wanted you [the jurors] to have the benefit of every piece, everything we knew about this case because of the magnitude of this case . . . . If you haven't done anything you can't be indicted. If you haven't done anything there is no reason to be frightened. . . . [T]he burden that was on me was to [victims] Mr. Bell and to Mr. Smith and Mr. House and Mr. Moore, saying to them I know a person that was involved in either the death of your son or the robbery and I can't do nothing with him. That's the thing, that's the burden that was on me. But I had no proof, so I told him, if you will tell the truth, get up there and tell the truth, then yes, you will [sic] have to worry about what happens to you in this case. But the burden that I had was a burden to them. Because I know that he is involved. He knows that he is involved, but I can't do nothing with him. I can't come before you, ladies and gentlemen, without proof on a person. That's not the way our law is written.

Johnson contends that these statements were calculated to bolster Davis's credibility with the jury. The Tennessee Supreme Court reviewed these passages and rejected the objections as without merit. *State v. Johnson*, 632 S.W.2d at 545.

Johnson offers nothing on appeal to indicate that the decision of the state court was in error. We find that the statements here at issue, in the particular context in which they were made, do not rise to the level of misconduct.[16] *Cf. Hodge*, 426 F.3d at 377-80 (finding the prosecutor's statements that a key witness was "lying to extricate himself from what he's done" and that another key witness was "absolutely believable" constituted misconduct).

2.

Johnson next contends that District Attorney General Shriver inflamed the passions of the jury by improperly using inflammatory language and injecting statements of personal interest into his closing argument. We agree.

---

[16]We note that it is not necessary for the prosecutor actually to use the words "I believe," or some similar phrase, for a statement to constitute an improper comment on the credibility of witnesses. *See Hodge v. Hurley*, 426 F.3d 368, 379 n.20 (6th Cir. 2005). However, we find that Gray neither directly nor indirectly vouched for Davis's credibility through the statements at issue. *See Francis*, 170 F.3d at 550.

In his closing rebuttal argument, Shriver told the jury:

I have a very personal interest in this case and I suppose that is why I am here today. Little Bob Bell, twelve years old, started out in the first grade at Burton School with my twelve year old daughter. They started, they have gone through school together. Burton School, Stokes School, would have gone to John Trotwood Moore together this year. It could have been my little girl that was in that store, a witness eliminated. It could have been you. It could have been your children. It could have been any one of us, if we decided that we wanted to buy something from Bob Bell, at nine fifty-eight on July 5, 1980, we would have been dead.

Closing arguments that encourage juror identification with crime victims are improper. *See Hodge*, 426 F.3d at 384. Similarly, a prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears—rather than the evidence—to decide the case. *See Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000) (*overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003)). Here, the prosecutor's remarks were clearly calculated to trigger the jurors' emotions and fears. We therefore find the statement improper.

Because we find the statement improper, we must address whether the statement was flagrant and therefore warrants reversal.[17] *See United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997). "Even if the prosecutor's conduct was improper or even 'universally condemned,' we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Bowling*, 344 F.3d at 512 (internal citation omitted). Only one of the "flagrancy" factors is apposite in this case. It is apparent that the prosecutor referenced his own child—and the possibility that the jurors themselves could have been involved—quite deliberately. *See Bates*, 402 F.3d at 641. No other factor is applicable. Nothing in the record indicates that the remarks were intended to mislead the jury; the statements were undoubtedly intended to trigger the jurors' emotions, but they were made in the context of the prosecutor's recitation of the facts of the case. Indeed, throughout his rebuttal argument, Shriver encouraged the jury to focus on the evidence before it in reaching a decision. Further, the prosecutor's remarks—at least those before this court—were isolated. Finally, the evidence against Johnson was substantial and included the testimony of three eyewitnesses, in addition to Victor Davis. We therefore conclude that the prosecutor's remarks, though improper, were not flagrant.

If a comment is determined not to be flagrant, we will reverse only when: (1) the proof against the defendant was not overwhelming; (2) opposing counsel objected to the conduct; and (3) the district court failed to give a curative instruction. *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir. 1996). As discussed above, the evidence against Johnson was substantial. *See State v. Johnson*, 632 S.W.2d at 548 (reviewing the record and finding that the evidence established Johnson's guilt beyond a reasonable doubt). The record also shows that Johnson's counsel did not object to Shriver's remarks at trial. Finally, at the close of trial, the court provided the following curative instruction: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." As a consequence, the prosecutor's non-flagrant, though improper, remarks were not "'so egregious as

---

[17]We agree with the district court's conclusion that, although the prosecutor's statement was set forth in Johnson's direct appeal brief, the Tennessee Supreme Court did not specifically address whether the comments were improper. Once a federal claim has been presented to a state's highest court, the exhaustion requirement is satisfied, even if the state court failed to address a particular claim that was presented. *Meeks v. Bergen*, 749 F.2d 322, 325 n.1 (6th Cir. 1984). Because the claim was exhausted but not adjudicated, the district court properly turned to this court's four-factor test for determining whether a prosecutor's improper statements are sufficiently "flagrant" to warrant a new trial.

to render the trial fundamentally unfair'" and therefore do not warrant reversal. *See Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (quoting *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1992)).

3.

Johnson next contends that the State knew of Debra Smith, an eyewitness to Johnson's presence at the scene of the robbery, as early as July 15, 1980, but concealed her existence until January 2, 1981, and this concealment compromised his defense. The facts surrounding this allegation are not in dispute. On September 3, 1980, Johnson filed a request for discovery that specifically sought, among other things, the names of any witnesses the State intended to call to testify at trial and the names of all persons known to have been present at the time of the robbery. On September 23, 1980, the State responded that all of the witnesses it intended to call at trial were listed in the indictment, which did not include Debra Smith. On November 17, 1980, Johnson made a motion seeking to order the State to identify its witnesses. Neither the State nor the trial court responded to this motion. On January 2, 1981, eleven days prior to commencement of the trial, the State revealed that Debra Smith would testify as an eyewitness.

Under Rule 12.1(b) of the Tennessee Rules of Criminal Procedure, the district attorney general must disclose no later than ten days before trial the name and address of any witness on whom the state intends to rely to establish a defendant's presence at the scene of the alleged offense. The district attorney general complied with this rule. Further, the State's production of a witness that could place Johnson at the scene of the crime was not revelatory and did not necessitate development of a new defense theory. Indeed, Johnson's defense was already aware that two of the victims (Bob Bell and Louis Smith) had identified Johnson as their assailant. Also, in the days following disclosure of Debra Smith's identity, Johnson's counsel was able to and did gather significant information to impeach and discredit Smith's testimony. We therefore find that the prosecution's withholding of Smith's identity as a witness does not rise to the level of misconduct.

4.

Johnson next contends that the State initially misrepresented the time it would argue that the robbery took place, and that this comprised his defense. In its Motion for Notice of Alibi Defense filed on September 23, 1980, the State indicated that robbery took place between 10:00 p.m. and 10:10 p.m. The State's written discovery response, served at the same time, made the same representation. In his response to the motion, Johnson stated that he was at his father's house between 10:00 and 10:10. The State ultimately presented evidence at trial indicating that the robbery likely took place between 9:50 and 10:00 p.m.

Johnson fails to demonstrate how he was harmed by this discrepancy. In his answer to the State's request for an alibi notice, Johnson disagreed with the proffered hour of the incident and sought to reserve the right to call other witnesses who would testify to his presence before and after the robbery. At trial, Johnson did not limit his alibi evidence to the period of 10:00 p.m. to 10:10 p.m., but instead covered the period from 9:00 a.m. on July 5, 1980, until the following morning. Johnson also fails to provide any case law declaring that a lack of precision in the time alleged for an offense will violate due process. Accordingly, we find that the alleged misrepresentation does not constitute misconduct.

5.

Johnson contends that the cumulative effect of the alleged prosecutorial misconduct fundamentally compromised the fairness of his trial and was prejudicial to the extent that it constituted a deprivation of due process. However, as discussed above, we find that the

prosecution's personalized statement during closing argument was the sole occurrence of error. We therefore do not have multiple errors to cumulate.

D.

We next consider whether Johnson's trial counsel rendered ineffective assistance. Review of an ineffective assistance of counsel claim is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance and obtain relief under *Strickland*, Johnson must demonstrate that his counsel's performance was deficient and that this deficiency so prejudiced his defense as to render the trial unfair and the result unreliable. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* To satisfy the prejudice prong of the *Strickland* test, Johnson must show that a reasonable probability exists that, but for his counsel's unprofessional errors, the results of the proceeding would have been different. *Poindexter v. Mitchell*, 454 F.3d 565, 570 (6th Cir. 2006). Our review of counsel's performance is "highly deferential and counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* (internal quotation marks omitted).

The certificate of appealability specified two claims of ineffective assistance for: (1) failure to seek a continuance in light of developments that arose shortly before trial, and (2) failure to seek the recusal of the prosecutors in light of their involvement in the conversion of Victor Davis to a prosecution witness. We address each claim in turn.

1.

The Tennessee Court of Criminal Appeals found that Johnson's attorneys' failure to seek a continuance did not constitute ineffective assistance. *Johnson v. State*, 1988 WL 3632, at *4 (emphasizing the minimal impact resulting from the state's revelation of a new witness). AEDPA therefore limits our inquiry to assessing whether the state court's conclusion that Johnson failed to demonstrate ineffective assistance under *Strickland* was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.[18]

Johnson contends that, in light of the prosecution's revelation of Debra Smith as a witness eleven days before trial and the conversion of Victor Davis from the primary defense witness to a prosecution witness less than a week before trial, his counsel rendered ineffective assistance by not moving for a continuance to permit additional preparation for these developments. We disagree. Although it would have been perfectly rational for Johnson's counsel to seek a continuance, it is not apparent that any such delay would have been productive. As the Tennessee Court of Criminal Appeals found, Johnson's counsel had created "sound defense strategy," and the late revelations prior to trial did not offer a clear alternative strategy. *Id.* The prosecution's production of a witness (Debra Smith) that could place Johnson at the scene of the crime was not revelatory, as Johnson's counsel were already aware that two of the victims had identified Johnson as their assailant. Further,

---

[18] Johnson contends that the Tennessee Court of Criminal Appeals found that Johnson's attorneys' performance was not deficient and therefore did not reach the prejudice prong of *Strickland*. As a consequence, he argues, the deferential AEDPA standard should not apply to our consideration of the prejudice prong. Our review of the Court of Criminal Appeals's decision reveals that that court did not expressly distinguish between the two *Strickland* prongs. *See State v. Johnson*, 1988 WL 3632, at *4. Instead, the court found that "although the new aspects of the prosecution's case were clearly damaging, they were not of a type that could be rectified by delaying the trial." *Id.* This statement could be construed as a resolution of either *Strickland* prong, or both. However, because we find that the Court of Criminal Appeals at least found that Johnson's counsel's performance was not deficient, and this conclusion was not contrary to or an unreasonable application of federal law as determined by the Supreme Court, we need not determine whether the AEDPA standard applies to the prejudice prong.

as found by the Court of Criminal Appeals, Johnson's counsel "made every effort possible" in the days before trial to gain information to impeach and discredit Smith's potentially harmful testimony. *See id.* ("[T]he defense counsel prepared so thoroughly for trial that, despite the devastating nature of the sudden turn of fortune, we can think of little more that an attorney could have done during a continuance that counsel did not do at trial to counter this evidence.").

Because additional time would not necessarily have aided Johnson's defense, we cannot say that his counsel's failure to seek a continuance fell below an objective standard of reasonableness such to constitute deficient performance.[19] *See Strickland*, 466 U.S. at 688-89 (noting that "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"). His claim therefore fails.

2.

Lastly, we consider whether Johnson's counsel rendered ineffective assistance by not seeking the recusal of the prosecutors after they participated in the conversion of Victor Davis to a prosecution witness. The Tennessee Court of Criminal Appeals found that the prosecutors' actions at issue were proper and that Johnson's counsel's performance could not be deemed ineffective for not challenging evidence or actions that have already been found to be proper or acceptable. *Johnson v. State*, 1988 WL 3632, at *4. We agree. Further, Johnson concedes that no precedent supports his argument on this point. Instead, he argues only that "no conceivable sound trial strategy" would include permitting the prosecutors to recount their version of the examination of a witness. Without more, this bare allegation cannot establish objectively deficient performance. Because Johnson fails to demonstrate how his counsel's decision not to seek the prosecutors' recusal constituted deficient performance, we need not consider whether such failure resulted in prejudice to Johnson's defense.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

---

[19] Johnson asserts that his was an "eminently defensible and even winnable case," but he fails to show how a continuance would have been, or could have been, productive for his defense. Instead, he offers only that a continuance would have afforded his defense "time to regroup" and the ability to "appreciate the full significance" of the relatively late developments.

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Circuit Judge, concurring. I concur fully in the lead opinion and rely upon the lead opinion's sound reasoning as the basis for my decision. I write separately merely to emphasize my disagreement with the dissent's depiction of the value of the withheld evidence.

The dissent proceeds from the acknowledged premise that the appellant needs only to convince us "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." The dissent then attempts to persuade us why we ought not have confidence in the jury's verdict. But, the dissent grossly overstates the value of the withheld evidence and, as a result, its claims cannot survive scrutiny.

The dissent urges us to find, in light of the withheld evidence, that Debra Smith's story "rais[es] a substantial implication that the prosecutor had coached her to give it." Further, the dissent actually expresses "doubts as to whether she was even present in Bell's store on the night of the crime." Thus, according to the dissent, Debra Smith is not simply mistaken or even misleading — Debra Smith, under the direction of the prosecution, has concocted a story for the purpose of incriminating and convicting Cecil Johnson, an acquaintance toward whom she had no prior animosity. There is no support in the record for this accusation. Nor does the record contain any basis upon which to assume that the prosecution did what it would have had to do to obtain such perjured testimony, i.e.: (1) select her as a participant in this scheme; (2) instruct her to lie under oath — to tell this false story when, in fact, she had not even been in the store; and (3) coach her into giving this suspiciously inconsistent and unbelievable testimony, during which she repeatedly contradicted herself and other prosecution witnesses. Although the dissent does not specify, presumably, the prosecutors' motive would have been to produce a fourth witness placing Johnson at the scene of the crime. Of course, this requires us to assume that the prosecutors were so intent on obtaining Johnson's capital conviction that they would risk sanctions and prosecution for suborning perjury — an assumption wholly lacking factual support in this record. And, even more tenuous is the necessary assumption that Debra Smith acted without any motive whatsoever. The dissent offers nothing — not even idle speculation, much less evidence from the record — to indicate any motive for Debra Smith to commit this particular (extensive) perjury. To be sure, the dissent is perfectly correct that motive has no role in the legal analysis. I raise the question of motive only to demonstrate the incredibility of the dissent's theory, i.e., that Debra Smith was never even in the store and that she (with help from the prosecutors) concocted the entire story. Equally implausible — in light of that theory — is the dissent's later contention that "[She] might just simply have been mistaken." There is no question that Debra Smith was a poor witness, but contrary to the dissent's exaggerations, her weak and confused testimony does not demonstrate, or even suggest, that the prosecutors suborned perjury in obtaining it. Indeed, the record suggests the contrary, inasmuch as the prosecutors — had they been inclined to coach her into giving false testimony — surely would not have coached her to give testimony that was so confused and inconsistent. The withheld evidence does not render her testimony any less credible than it was on its own.

The dissent next urges us, again based on the withheld evidence, to completely disbelieve the identification testimony of the two eye-witnesses, Bob Bell and Lewis Smith, testimony which — from each of them — was otherwise coherent and consistent, both with the testimony of the other and with the prosecutors' theory of the case. I do not find their testimony questionable and thus, I do not lack confidence in the jury's verdict. Even if the withheld evidence did render the testimony questionable — which it does not — in order to agree with the dissent, one would have to conclude that the emphatic and unequivocal in-court identifications of Johnson were either terribly mistaken

or were part of a conspiracy to frame Johnson (a conspiracy orchestrated by the prosecution). And, while the dubious possibility exists that the potential for conviction would motivate the prosecution, the dissent's only answer to why these two victims would testify falsely against Johnson — thereby convicting an innocent man of murder while setting the actual murderer free — is that "[t]hey might just simply have been mistaken," and that without the withheld evidence, defense counsel was so "severely crippled" that it could not "bring[] to light such mistakes." Given the magnitude of these alleged mistakes, this claim is as incredible as it is demeaning to defense counsel and jury alike.

Having thus discarded the testimony of Debra Smith, Bob Bell, and Lewis Smith, the dissent would have us conclude that the prosecution was left with only the testimony of Victor Davis. And that testimony, the dissent posits, was coerced by the prosecutors with "dangled threats of prosecution and promises of immunity." But, as the dissent concedes, none of the withheld evidence had anything to do with Davis. Moreover, it is clear from the record that Johnson's counsel had ample opportunity to, and in fact did, cross-examine Davis about the circumstances of his arrest, detention, and initial story to the police, as well as his testimony incriminating Johnson. The jury had all of this information, and the dissent points to no new evidence to support its speculation that Davis's testimony was coerced. And while one could ascribe to this witness a motive to testify falsely — avoiding implication in this triple murder and obtaining immunity on other crimes — one would still have to assume, without basis, that in procuring this false testimony, the prosecutors were willing to risk sanctions or prosecution for suborning perjury. In short, the jury was aware of this witness's motive to lie and the withheld evidence does not cast any further doubt on this testimony.

In sum, the dissent surmises that if Johnson's counsel had been given the withheld evidence before trial, he might have convinced the jury that Debra Smith lied, Bob Bell and Lewis Smith either lied or erred drastically, and that this — when added to the argument that Davis's testimony was coerced and therefore unreliable — so undermines confidence in the jury's verdict that the trial was unfair. But the withheld evidence, considered in context with the totality of the evidence, is neither as damaging to the witnesses nor as beneficial to the defense as the dissent suggests. And though the dissent argues that the evidence is exculpatory, that too is a gross exaggeration — it points to one witness's misidentification, it does not point to anyone else as the murderer (there is no "Beanie" in this case) and it does not even point away from Cecil Johnson. At most, the withheld evidence makes a little bit of already questionable evidence a little bit more questionable. This does not reduce confidence in the jury's verdict and this is not a valid basis for habeas relief.

———————————

**DISSENT**

———————————

R. GUY, COLE, JR., Circuit Judge, dissenting. The facts giving rise to Johnson's *Brady* claim are undisputed and straightforward. The entire case against Johnson consisted of only four witnesses and no physical evidence. One of the four witnesses was originally scheduled as an alibi witness to corroborate Johnson's innocence. On the day before trial, after a coerced midnight encounter with the State prosecutor, that witness flipped. As for the other three witnesses, the State admits that the prosecution withheld evidence that would have impeached each witness' identification of Johnson as the perpetrator. To say the least, the jury saw a markedly different trial than it would have had the prosecution honored its *Brady* obligations. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Accordingly, the Tennessee Court of Criminal Appeals unreasonably determined that the withheld evidence was immaterial and that, without it, Johnson still received a fair trial "resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Because "'fairness' cannot be stretched to the point of calling this a fair trial," *id*. at 454, I dissent.

**I.**

It is fundamental and firmly established that a defendant's due process rights are violated where the government (1) withholds evidence (2) favorable to the defendant (3) that is "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. The State concedes that it withheld favorable evidence that would have assisted in Johnson's defense. At issue is only whether the suppressed evidence was material.

*Brady* materiality is established where, viewing the withheld evidence collectively, the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). The Supreme Court has repeatedly stated that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id*.; *accord, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006). Indeed, "[t]he reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id*. (quoting *Kyles*, 514 U.S. at 435). The Supreme Court has referred to this as only a "reasonable probability" or a "significant possibility" of a different result. *See, e.g.*, *id*.; *Strickler v. Greene*, 527 U.S. 263, 298 (1999) (Souter, J., concurring in part and dissenting in part) (explaining that "[reasonable] 'probability' raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, 'more likely than not'" and preferring the phrase "significant possibility"). Accordingly, *Brady* materiality is not a sufficiency-of-the-evidence test. *Kyles*, 514 U.S. at 434. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 434–35; *accord Castleberry v. Brigano*, 349 F.3d 286, 294 (6th Cir. 2003).

The prosecution withheld six items[1] of evidence that, when considered collectively, as we must, compel the conclusion that Johnson's trial did not produce an outcome worthy of confidence. As the Supreme Court of Tennessee explained, "[Johnson]'s insurmountable problem in this case was not Davis's testimony, but the testimony of the three eyewitnesses, two of whom looked into the barrel of the pistol held by [Johnson] and were shot by him." *State v. Johnson*, 632 S.W.2d 542, 547 (Tenn. 1982). Had the prosecution honored its *Brady* obligations by disclosing the six relevant items of suppressed evidence, then the value of two of those "insurmountable" witnesses, Bob Bell and Debra Smith, would have been substantially reduced, and the value of the third, Louis Smith, would have been obliterated. A review of the withheld evidence reveals that its disclosure "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. As Supreme Court precedent directs, I proceed with an evaluation of "the tendency and force of the undisclosed evidence." *Id.* at 437 n.10.

The first item of withheld evidence was a police report prepared by Detective Moore, regarding his interview of Bell the day after the crimes. This report would have undermined Bell's identification of Johnson as the perpetrator. Bell testified that he was familiar with Johnson because Johnson had frequented Bell's store in the past, that the assailant had some facial hair, and that Johnson was the assailant. It is undisputed that at the time of the crimes Johnson had a goatee and a light moustache. Thus, the jury heard testimony from Bell that was internally consistent. In Detective Moore's suppressed report, however, Bell described the assailant as having "no facial hair." (JA 274.) Without employing any fantastic leaps of imagination, this withheld report would have called into question the reliability of Bell's identification. Simply put, by suppressing the report, the prosecution was able to prevent the jury from learning a crucial inconsistency between Bell's initial description of the assailant and Bell's identification of Johnson. Because reliability of identification testimony depends in large part on the accuracy of a prior description, *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), Bell's identification would have been substantially undermined by the use of this withheld police report.

The second item of evidence suppressed by the prosecution would have cast further doubt on the reliability of Bell's testimony—a medical report revealing that Bell had a history of "some mental instability." (JA 1288.) As the majority highlights, any cross-examination regarding Bell's mental health would by necessity have proceeded delicately. This, however, does not mean that defense counsel would not have been able to use it to further undermine Bell's credibility. Although its suppression may not rank with the failure to disclose Detective Moore's police report, it certainly would have had some value to competent counsel, "and it counts accordingly in determining whether . . . materiality is satisfied." *Kyles*, 514 U.S. at 450. In short, the medical report "would have had some weight and its tendency would have been favorable to [Johnson]." *Id.* at 451.

The third item of evidence suppressed by the prosecution would have impeached another "insurmountable witness," Debra Smith, by raising doubts as to whether she was present in Bell's store on the night of the crimes. The prosecution withheld a police report prepared by Detective Robeck, revealing that Louis Smith indicated that no female customers entered the store during the robbery. This evidence would have further undermined Debra Smith's testimony, which, both the majority and concurrence acknowledge, was already suspect. Debra Smith testified that, upon entering Bell's store on the night of the crimes, she immediately realized that a robbery was in progress, yet still purchased a soft drink and inexplicably failed to call the police once she returned

---

[1] Johnson claims that the prosecution withheld seven items. One of the items is a defense filing in an unrelated case that arguably would have been readily available to Johnson by trial time. As that item does not change my analysis, I proceed assuming that it is not part of the *Brady* calculus and address only six of the suppressed items. *See, e.g.*, *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007) ("[W]hen the information is readily available to the defense from another source, there simply is nothing for the government to 'disclose.'" (citing *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998))).

home. Even more curiously, her testimony repeatedly described Louis Smith, one of only four people apparently in the store when she entered, as a Black man. Louis Smith, however, is white. Consistent with this theory, the prosecution never alleged a female was present in the store during the robbery until only a few days before trial when it named Debra Smith as a potential witness. This withheld police report puts at issue whether Debra Smith was in Bell's store that night and, in the hands of competent defense counsel, would have "fueled a withering cross-examination, destroying confidence in [Debra Smith's] story and raising a substantial implication that the prosecutor had coached [her] to give it." *Id.* at 443.

As the majority and concurrence point out, even without the disclosure of this withheld police report, Debra Smith's testimony was weak, inconsistent, and significantly impeached. There is no question, however, that this report could have been used to further impeach Debra Smith, and may even have been used to expose potential prosecution improprieties, like coaching. The implication of coaching would have been strengthened by the suspicious circumstances surrounding Davis's conversion, which raises further questions of prosecutorial misconduct. Quite simply, it is unreasonable to conclude that the withheld report would have had no value as exculpation or impeachment, and therefore it too must be counted towards determining whether materiality has been satisfied. *See Kyles*, 514 U.S. at 450.

I save the worst for last. The fourth, fifth, and sixth items of evidence withheld by the prosecution relate to Louis Smith. Smith testified that he got a "good look" and even a "real good" look at the assailant's face. (JA 334, 364.) He further testified that he correctly identified Johnson from a photo array. By all accounts, Smith was a strong witness for the prosecution. The following three items of suppressed evidence in the hands of competent defense counsel, however, would have obliterated his value as a prosecution witness.

Officer Dobson prepared a police report from an interview with Louis Smith immediately after the shootings. This report indicates that Smith disavowed *any ability* to identify the assailant: "I then talked to [Louis Smith] who related he was inside the market working on a motor when assailant entered the market and shot and robbed him for no reason and he saw him to be a [young, Black male] *but did not see assailant*['s] *face*." (JA 1276 (emphasis added).) Smith's inability to describe the assailant was similarly noted in another police report prepared by Detective Flowers shortly after the crimes: "Louis Smith advised he could not describe susp[ect] at this time but is willing to be reinterviewed at a later date." (JA 1278.) Finally, and most alarmingly, a withheld police report prepared by Detective Robeck reveals that Smith did not pick Johnson's picture out of a pre-trial photo array, but instead chose the pictures of two *other* young, Black males. (JA 298–99, 1281.) It is not hard to imagine what competent defense counsel would have done had the prosecution disclosed these three crucial items. Doubtless, their disclosure would have effectively reduced Louis Smith's value as a prosecution witness to nil. Importantly, the prosecution's suppression of these items also prevented the jury from learning that, to the extent Louis Smith could identify the assailant, he identified someone *other than Johnson*, rendering these items exculpatory as well, despite the concurrence's best attempts to characterize Louis Smith's selection of someone other than Johnson from a photo array containing Johnson's photo as a mere "misidentification."

Moreover, the demise of Louis Smith as a credible prosecution witness would have done more than just nullify his testimony. For instance, it would have served to discredit generally the police and prosecution methods employed in assembling the case against Johnson, calling into question the veracity of the other "insurmountable witnesses" and Davis. As the Fifth Circuit aptly explained, the consequences of destroying one eyewitness extend beyond just that witness:

> We are tempted, but not persuaded, by this arithmetical approach; our experience at the bar has been that positive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and that the

destruction by cross-examination of the credibility of one of two crucial witnesses—even if the other remains untouched—may have consequences for the case extending far beyond the discrediting of his own testimony.

*Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

Confronted with this, the Tennessee Court of Criminal Appeals nonetheless determined that Supreme Court precedent did not compel the conclusion that the withheld evidence was material. *See Johnson*, 1997 WL 738586, at *8. Curiously, the Tennessee court cited *Kyles* only once, notwithstanding that *Kyles* came down two years before the Tennessee court's decision and that it was, and still is, the Supreme Court's most thorough application of *Brady* to any set of facts. *See id.* at *4 (citing *Kyles* for the proposition that "[t]he court must view the suppressed evidence collectively in the context of the entire record to determine whether the evidence is material under *Bagley*"). Regardless, because Johnson's *Brady* claim presents at least as strong a case for materiality as *Kyles*, the Tennessee court's determination that the withheld evidence did not satisfy *Brady* materiality was an unreasonable application of Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–07 (2000) ("[A] state-court decision involves an unreasonable application of [Supreme Court] precedent if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case.").

In *Kyles*, the Supreme Court reversed a Fifth Circuit decision holding that evidence withheld by the prosecution was immaterial under *Brady*. 514 U.S. at 454. Kyles was convicted of the daytime murder of a woman outside a grocery store. *Id.* at 423. There was a mountain of evidence against Kyles, which included four eyewitnesses, the murder weapon found in Kyles's apartment, and some of the victim's personal effects found in Kyles's trash. *Id.* at 430–32. That is, unlike the case against Johnson, physical evidence implicated Kyles. The prosecution withheld the following exculpatory evidence: six contemporaneous eyewitness statements taken by police that would have impeached two of the four eyewitnesses, and various statements, memoranda, letters, and recordings relating to "Beanie," a police informant, who did not testify at trial, but was responsible for directing the investigation towards Kyles. *See id.* at 423–26. At best, the Supreme Court acknowledged that disclosure of the evidence would have served to raise some questions about whether the gun and victim's personal effects were planted by Beanie in an attempt to frame Kyles, and would have "substantially reduced or destroyed" the value of two of the four eyewitnesses. *Id.* at 441. Not every item of the State's case, however, would have been directly undercut had the suppressed evidence been disclosed. Importantly, the Court recognized that two eyewitnesses would have remained untouched. These eyewitnesses consistently identified Kyles as the perpetrator immediately after the murder, in a photo array, and in court. Moreover, even without the eyewitness testimony, the overwhelming physical evidence still would have pointed towards Kyles, unless the jury had believed that Beanie was the mastermind behind a massive conspiracy to frame Kyles—an account that Justice Scalia described as "strain[ing] credulity to the breaking point." *Id.* at 470 (Scalia, J., dissenting).

Comparing the probable impact of the withheld evidence in *Kyles* to the probable impact of the evidence withheld by the State that would have been favorable to Johnson compels the conclusion that the withheld evidence in Johnson's case is material. Here, the withheld evidence would have served to attack all three eyewitnesses, leaving the State with only Davis's testimony. Davis, of course, was a nineteen-year-old, who changed his story the day before trial after a coerced midnight encounter with a prosecutor who dangled threats of prosecution and promises of immunity before Davis. Indeed, his testimony was sufficiently suspect that the Supreme Court of Tennessee discounted it in affirming Johnson's convictions. *See Johnson,* 632 S.W.2d at 547. Because the case against Johnson relied almost exclusively on eyewitness identification, the materiality of the

withheld evidence, which called into question the testimony of *all three* eyewitnesses, compels a materiality finding.

True enough, the withheld evidence would not have directly undercut Davis's testimony, and, therefore, even had the withheld evidence been disclosed, there may have been sufficient evidence for a jury to convict, notwithstanding the suspicious nature of Davis's conversion. That is, any reasonable jury may very well have believed Davis's testimony. But this is not the proper inquiry. *Brady* materiality is not a sufficiency-of-the-evidence test. *Kyles*, 514 U.S. at 434. The withheld evidence need not touch every prosecution witness and every item of incriminating evidence before materiality is satisfied. To be sure, "the effective impeachment of *one eyewitness* can call for a new trial even though the attack does not extend directly to others." *Id.* at 445 (citing *United States v. Agurs*, 427 U.S. 97, 112–13 n.21 (1976)) (emphasis added).

Consistent with this, we have concluded that withheld evidence satisfies materiality where its disclosure would have left several prosecution witnesses completely unscathed. For instance, in *Castleberry v. Brigano*, we held that three items of suppressed evidence, when evaluated collectively, "strongly support[ed] the conclusion that Castleberry's trial did not produce an outcome worthy of confidence," thus satisfying *Brady* materiality. 349 F.3d at 292. In reaching this conclusion, we acknowledged that some testimony of witnesses present at the scene of the crime "would not have been contradicted by the withheld evidence." *Id.* at 294. Nevertheless, we acknowledged, "[t]he key question . . . 'is not whether the state would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same.'" *Id.* (quoting *Kyles*, 514 U.S. at 453).

The Supreme Court explained this principle in *Kyles*:

> [N]ot every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed. It is significant, however, that the physical evidence remaining unscathed would . . . hardly have amounted to overwhelming proof that Kyles was the murderer. . . .
>
> . . . .
>
> The inconclusiveness of the physical evidence does not, to be sure, prove Kyles's innocence, and the jury might have found the eyewitness testimony . . . sufficient to convict . . . . But the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same.

514 U.S. at 451, 453.

Before concluding, I am compelled to address the concurrence's disagreement with what it calls my "depiction" of this case. By my best reading, I find three wholly unconvincing points buried in the concurrence and nary a citation.

The first point seems to be that the six items of withheld evidence were all impeaching as opposed to exculpatory, and that this would have rendered it somehow less valuable to competent defense counsel. This is a distinction not supported by case law. The Supreme Court has repeatedly "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes." *E.g.*, *Kyles*, 514 U.S. at 433; *Bagley*, 473 U.S. at 676. Regardless, it is also a contention unsupported by the record. As mentioned, the suppressed Detective Robeck report would have revealed that Louis Smith did not pick Johnson's picture out of a pre-trial photo array, but instead chose the pictures of two *other* young, Black males. That the concurrence characterizes this as a mere "misidentification" strains credulity and ignores the Supreme Court of Tennessee's finding that

Louis Smith's testimony was "insurmountable" because he supposedly "looked into the barrel of the pistol held by [Johnson] and [was] shot by him." *Johnson*, 632 S.W.2d at 547.

The concurrence's second concern appears to be that no motive existed for the three witnesses to implicate Johnson. This concern again finds no basis in law or fact. The touchstone of materiality is a "reasonable probability" of a different result. *Kyles*, 514 U.S. at 434. All suppressed evidence that has any value as exculpation or impeachment counts in determining whether materiality is satisfied. *Id.* at 450. Indeed, even the concurrence must begrudgingly admit that the suppressed evidence would have assisted Johnson's defense, notwithstanding that the witnesses apparently had no motive to lie. Surely, to conclude otherwise would be to proceed with blinders. Regardless, even assuming that the three eyewitnesses here had no motive to lie, the concurrence's assertion that they needed a motive to implicate the wrong person defies common sense. They might just simply have been mistaken. The hallmark of an effective defense is bringing to light such mistakes. Without the suppressed evidence, there is no question that Johnson's defense was severely crippled in accomplishing this basic defense task.

Finally, the concurrence appears to conclude, after summarily discounting almost the entire value of the suppressed evidence, that it would still have found Johnson guilty of the murders had it been a juror in a hypothetical trial where the suppressed evidence was disclosed. Musing about such hypotheticals, however, is unnecessary because that is not what *Brady* directs. Supreme Court precedent is crystal clear: the *Brady* materiality inquiry "is not a sufficiency of the evidence test." *Id.* at 434. "[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Id.* at 453. Here, there can be no confidence.

Johnson's case is not even a close one. As in *Kyles*, *Brigano*, and others, the same is true here: confidence that Johnson's verdict would have been the same simply cannot survive a recap of the suppressed evidence and its significance for the prosecution. The withheld evidence, taken together, reveals at a minimum that one witness's first and most lucid description of the assailant did not comport with his in-court identification, that one witness may not have been present in Bell's store on the night of the crimes, and that one witness implicated someone other than Johnson when confronted with a photo array containing Johnson's picture. These were the same three witnesses that the Supreme Court of Tennessee called Johnson's "insurmountable problem." *Johnson*, 632 S.W.2d at 547. Had the prosecution disclosed the six items of withheld evidence, competent defense counsel may very well have destroyed the value of their identifications, or at least raised serious questions in the jurors' minds as to their reliability. This is to say nothing of the potential inferences of police and prosecutorial misconduct that the jurors may also rationally have made had they been apprised of the suppressed evidence. Simply put, Johnson's defense was substantially crippled in cross-examining the three critical witnesses on the only serious issue in this case—identification. *See Lindsey*, 769 F.2d at 1040. "No reasonable court can have confidence in the decision of a jury that did not hear this withheld evidence." *Castleberry*, 349 F.3d at 294 (citation omitted).

## II.

The Tennessee Court of Criminal Appeals applied *Kyles* unreasonably when it determined that the evidence withheld by the prosecution was immaterial and that, without it, Johnson received a fair trial resulting in a verdict worthy of confidence. Such unreasonable application of Supreme Court precedent mandates that we grant Johnson's petition for a writ of habeas corpus. So, I dissent.